Rajani K. **KANTH**, Plaintiff,

v.

Cory Leigh **KANTH**, Defendant.

No. 2:99CV532C.

United States District Court,
D. Utah,
Central Division.

Dec. 14, 1999.

---

Mr. Rajani K. Kanth, New York City, plaintiffs pro se.

Mr. Frederick N. Green, Salt Lake City, UT, for defendant.

## ORDER

CAMPBELL, District Judge.

Mr. Kanth has filed this petition under the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–11610 ("ICARA"), and the Convention on the Civil Aspects of International Child Abduction, included in the Hague Convention adopted on October 25, 1980 ("the Hague Convention"). Mr. Kanth alleges that Mrs. Kanth wrongfully removed the children from Australia to the United States, and that, under the Hague Convention, the children must be returned to Australia so that the courts of that country can determine custody. For the reasons stated below, Mr. Kanth's petition is denied.[1]

### Background

Mr. and Mrs. Kanth and their two daughters are citizens of the United States. Mr. Kanth was born in India, but moved to the United States. He became a naturalized United States citizen in 1985. Mr. and Mrs. Kanth were married in Salt Lake City, Utah, in March 1990. Both of the Kanth daughters were born in Salt Lake City: Malini Amstel Kanth in 1993 and Anjana Kesari Kanth in 1996.

Mr. Kanth is a college professor. In 1993, the University of Utah denied Mr. Kanth tenure. Although he made application to numerous universities, he was unable to find an acceptable position in the United States. In 1996, Mr. Kanth accepted a temporary academic position with the University of Aarhus in Denmark; he left the United States in June of that year. Mrs. Kanth and the children stayed in Salt Lake City until September 1996, when they joined Mr. Kanth in Denmark.

The Kanths did not stay long in Denmark. Mrs. Kanth and the children returned to Salt Lake City in April 1997; Mr. Kanth returned in September of that year. Following their return, Malini enrolled in a preschool in Salt Lake City. According to Mrs. Kanth, Malini made friends in the preschool and generally excelled.

Because Mr. Kanth was not able to locate an acceptable academic position in the United States, he again accepted a teaching position in a foreign country, at the University of New South Wales, Australia. Mrs. Kanth opposed the move, consenting to go only when Mr. Kanth told her that the family's stay in Australia would last only six months.[2] The Kanth family traveled to Australia on temporary visas, arriving in July 1997. They left behind most of their household furnishings and personal belongings, including many of the children's toys. These items were stored primarily with Mrs. Kanth's family in Salt Lake City. (*See* Cory Leigh Kanth Aff. Exhibits) (Photographs).

The Kanth family was in Australia for a total of nine months, from July 1997 to April 1998. While in Australia, Mr. Kanth continued to seek teaching positions in the United States. When his efforts were unsuccessful, he agreed to continue in his teaching position at the University of New South Wales for six months. However, Mr. Kanth did not complete this second six-month term. He and his family returned to Salt Lake City in April 1998. When the family left Australia, they broke their lease on their apartment and forfeited a $1,120 rental bond.

---

1. This matter was set for oral argument on December 9, 1999. However, Mr. Kanth, who now lives in New York, requested that oral argument be continued. Because the progress of this case has been slow, the court was reluctant to grant such a continuance. Mr. Kanth agreed that the court could resolve the matter on the basis of the written material, without oral argument. The court has now carefully considered the materials of the parties (those that were filed within the deadlines set by the court) and concludes that oral argument would not assist the court in reaching a decision.

2. Mr. and Mrs. Kanth disagree sharply over whether they intended that their stay in Australia would be permanent or temporary. The evidence before the court, as discussed below, leads the court to the conclusion that Mrs. Kanth is correct when she states in her affidavit that neither she nor Mr. Kanth intended to permanently settle in Australia.

Although Mrs. Kanth states that the family returned to the United States because Mr. Kanth had an interview at Franklin and Marshall College in Pennsylvania, a fact the court accepts as correct, two letters submitted to the court by Mrs. Kanth indicate that the family may have also left Australia as a result of Mr. Kanth's personal difficulties. The first letter is from Dr. Graham Voss, Associate Head of the School of Economics at the University of New South Wales. In the letter, Dr. Voss acknowledged that Mr. Kanth was resigning his "visiting position" as of April 2, 1998. Dr. Voss stated: "Again, let me express my sympathies with your difficulties and wish you and your family all the best in the future." (Cory Leigh Kanth Aff.Exs. at 1933) (Letter from Voss to Kanth of 3/30/1998). The second letter was sent by a counselor (the signature is illegible) from the Solution Focused Counselling Centre. The author obviously knew of problems Mr. Kanth was facing. The letter begins: "Thanks for the post card. Obviously you made it back to Utah and memories of Australia have hopefully faded a little." (*Id.* at 195) (Letter of 5/11/1998). After giving Mr. Kanth encouragement and advice about his mental and emotional state ("I am impressed that you have started work on controlling your 'demons' "), the author concludes with the statement: "Hope you will be smiling more now that you are back in the States. Keep in touch." (*Id.*)

Back in Utah, the children apparently settled into the routine and practices they had had before the move to Australia. Malina returned to the same preschool. The children renewed their ties with Mrs. Kanth's family, with whom the children were very close. (Mrs. Kanth's family were the only relatives the children knew). The children were seen by Dr. Tom Metcalf, who had been their pediatrician since their births. (The children were seen by several different doctors for illnesses in Australia).

Mr. Kanth accepted a temporary research fellowship at Harvard University, and pursued his interview opportunity in Pennsylvania. Mr. Kanth hoped that his Harvard fellowship would help him obtain a teaching position in the United States. Roger Owen of Harvard University wrote a letter of recommendation for Mr. Kanth. In his letter, Mr. Owen noted:

> Since leaving the University of Utah Rajani has led a somewhat peripatetic existence, teaching in Denmark and Australia and working on his general critique of Enlightenment thinking. He continues to be as productive of new ideas as ever. But he certainly needs somewhere to rest awhile if he is to exploit these new veins of thought to the full.

(*Id.* at 020) (Letter from Owen to Kanth of 5/11/1998).

When Mr. Kanth did not find a teaching position in the United States, he accepted a three-year position at the University of Technology ("UTS") in Sydney, Australia, and the Kanth Family left for a second stay in Australia in July 1998. Again, most of the family's furniture and personal belongings were left behind in Salt Lake City.

Although Mr. Kanth contends that the family intended to stay in Australia, the evidence in the record does not support his contention. Mrs. Kanth states in her affidavit that they left reluctantly for Australia, and that Mr. Kanth had assured her they would return to the United States by autumn in 1998. Mr. Kanth believed that he would soon have a job with Duke University. Mrs. Kanth's statement that her husband anticipated that he would be receiving a job offer from Duke University is corroborated by an e-mail message, sent by Mr. Kanth to Mrs. Kanth's father, telling him of the family's address in Sydney and asking him to "send us any normal mail to the new address indicated above (this is important since DUKE UNIVERSITY will be writing to me at your address) OR you can open the mail and read it to see what it says and then call us (this is better for being much FASTER.)" (*Id.*

at 056) (e-mail from Kanth to Meyer of 7/23/1998).

When the position at Duke University did not materialize, Mr. Kanth continued to apply for other positions in the United States. In October 1998, Mr. Kanth wrote an application letter to Florida Atlantic University in which he declared:

I am specially happy to be applying to Florida Atlantic for a suitable position in economics. Briefly, my current status is that I am in the running for a Chair in economics here at the UTS, having just returned from a visiting stint at Harvard. However, my sights are set elsewhere: for years now, I have been seeking to return to the U.S. for professional and personal reasons (my family lives in Utah.)

(*Id.* at 021) (Letter from Kanth to Florida Atlantic University of 10/10/1998).

In a letter written to Mrs. Kanth's father in May 1999, Mr. Kanth makes clear his desire to find work in the United States:

I am trying my best, as I have had for years, to find employment back in the US: in the very short run, this may or may not happen. But the long run prospects remain very high given the level of my productivity. It may happen as early as this Fall, or maybe a bit later.

(*Id.* at 032) (Letter from Kanth to Meyer of 5/5/1999).

According to Mrs. Kanth, Mr. Kanth feared that the time he spent as a lecturer at UTS, a business school, and not as a professor at a nationally-ranked university, would damage his academic reputation and his future job opportunities. In fact, Mr. Kanth was apparently so dissatisfied with his position at UTS, that he considered accepting a job at the National University of Singapore, when an offer was extended to him in January 1999. (*Id.* at 027) (Letter from National University of Singapore to Kanth of 1/29/1999).

During their second stay in Australia, the Kanth family again lived in rented apartments. According to Mrs. Kanth, the family lived in a total of seven different rented lodgings during their two stays in Australia.

Mr. and Mrs. Kanth disagree about the children's adjustment to their life in Australia. According to Mr. Kanth, the children enjoyed life in Australia and had friends and playmates there. Mrs. Kanth disputes this claim and goes into considerable detail about the loneliness her children experienced during both their stays in Australia. (Cory Leigh Kanth Aff. at 25–27.) The evidence is not clear on this question. For example, Malini was a student at the Randwick School during the family's second stay, and her December 1998 report card from the school reflected that she was "a very capable child" and did well in her studies. (Cory Leigh Kanth Aff.Exs. at 143) (Student Progress Report). However, the teacher noted that Malini was "quite timid and reserved." (*Id.*). On the other hand, Malini's principal at the Randwick School, Peter Kensell, stated that "Socially, Malini had a number of close friends who enjoyed her company in the classroom and the playground." (Petitioner's Mem.Supp. Petition Ex. J) (Letter from Kensell to whom it may concern of 6/23/1999). Mr. Kanth also asserts that Malini engaged in various extracurricular activities while in Australia, such as piano lessons and ballet. However, there is nothing in the record that casts doubt upon Mrs. Kanth's statements that Malini attended these activities infrequently, going to only three piano lessons and one ballet lesson. (Cory Leigh Kanth Aff. at 26.)

Mr. Kanth has submitted several letters from professional colleagues. For the most part, none of the letters are of particular assistance to the court because of their conclusory nature, lack of detail, and statements to the effect that Mr. and Mrs. Kanth enjoyed a warm, loving relationship. Such assessments cast doubt on the accuracy of the other statements made by the authors, because there is no question that the relationship between Mr. and Mrs. Kanth was deeply troubled and worsened

during their stays in Australia, and by March 1999, the relationship between Mr. and Mrs. Kanth had deteriorated to the point that Mrs. Kanth returned to Salt Lake City with the children.

### Discussion

The purpose of the Hague Convention is "to secure the prompt return of children wrongfully removed or retained" so that the courts of the county where the children habitually reside may make a determination of custody. *Hague Convention,* Art. 1.

To obtain relief under the Hague Convention, a petitioner has the burden of proving, by a preponderance of the evidence, that the children have been wrongfully removed or retained. *See* 42 U.S.C. § 11603(e)(1). A removal or retention is "wrongful" if:

(a) it is in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention; and

(b) at the time of removal or retention those rights were actually exercised....

*Hague Convention,* Art. 3.

The first question, then, is whether Australia was the habitual residence of the two Kanth daughters before Mrs. Kanth took them from Australia in March 1999. If the habitual residence of the children was not Australia, then there was no wrongful removal. *See In re Application of Ponath,* 829 F.Supp. 363, 364 (D.Utah 1993) (internal citation omitted).

The term "habitual residence" is not defined in either the Hague Convention or ICARA. Courts have speculated that the " 'intent is for the concept [habitual residence] to remain fluid and fact based, without becoming rigid.' " *Id.* at 365 (quoting *Levesque v. Levesque,* 816 F.Supp. 662, 665 (D.Kan.1993)).

The Third Circuit has discussed the concept of habitual residence in detail, noting that although it is the child's habitual residence that must be determined, in the case of a young child, "the conduct and the overtly stated intentions and agreements of the parents during the period preceding the act of abduction are bound to be important factors and it would be unrealistic to exclude them." *Feder v. Evans–Feder,* 63 F.3d 217, 223 (3rd Cir.1995). The court further explained.

[T]here must be a degree of settled purpose. The purpose may be one or there may be several. It may be specific or general. All that the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.

*Id.* (citation omitted). The court determined that:

a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization which has a degree of "settled purpose" from the child's perspective. We further believe that a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there.

*Id.* at 224.

When the above definitions are applied to the facts here, it is evident that the habitual residence of the Kanth daughters immediately before being taken to the United States in March 1999 was not Australia but the United States. In March 1999, Malina was almost six years old, Anjana three. They had spent nine months in Australia on their first stay, and approximately the same amount of time on

their second. Although Malina had attended school in Australia, the evidence suggests that she may have had difficulty finding friends in school and felt isolated. And as far as whether Anjana could be seen as settled in Australia, due to her young age, the focus must be dictated by the perspective of her parents.

Also significant, and evidence that the children would not have been "acclimatized" to their life in Australia and would not have felt "settled" in their Australian surroundings, is the fact that the family lived in a succession of rented dwellings. Adding to the unfamiliarity of the children's surroundings, the rented accommodations in which they were living were not furnished with the family's own belongings. The photographs submitted by Mrs. Kanth show that much of the family's furniture and personal belongings were stored while the family was in Australia. The stored belongings include such items as Malini's rocking chair, the children's chest and toy cupboard, the children's yard furniture, and Malini's bicycle and Anjana's tricycle. Such items are the kind that children rely on to give them a sense of home and belonging, and the Kanth children did not have these familiar belongings with them when they were in Australia.

The evidence is also overwhelming the children's parents believed that their two stays in Australia would be temporary, and brief. Mrs. Kanth adamantly insists that she went to Australia reluctantly, relying on her husband's assurance that the family would quickly return to the United States. And Mr. Kanth's constant search for a teaching position in the United States, as shown by the numerous letters to and from colleges and universities in the United States, as well as his own words in his letter to Mrs. Kanth's father, undermines his present assertion that it was the family's intention to remain in Australia.

In sum, Mr. Kanth has failed to show that Australia was the habitual residence of the children and, accordingly, his petition is DENIED.