Perry A. MARCH, in his capacity as the father of Samson Leo March and Tzipora Josette March, both minor children, Petitioner,

v.

Lawrence E. LEVINE and Carolyn R. Levine, Respondents.

No. 3:00 0736.

United States District Court, M.D. Tennessee, Nashville Division.

Oct. 4, 2000.

John E. Herbison, Nashville, Robert S. Catz, Cadiz, KY, for Perry A. March, in his capacity as father of Samson Leo March and Tzipora Josette March, minor children, pltfs.

James Glasgow Martin, III, Gregory Dye Smith, Farris, Warfield & Kanaday, Nashville, for Lawrence E. Levine, Carolyn R. Levine, defts.

**1.** A multitude of other motions have been filed by both parties. They will be discussed

## MEMORANDUM

TRAUGER, District Judge.

On August 3, 2000, Perry A. March filed a Petition for Return of Minor Children Pursuant to International Child Abduction Remedies Act, seeking the return of his two minor children, Samson Leo March, age 10, and Tzipora Josette March, age 6, to Mexico. The respondents, Carolyn R. Levine and Lawrence E. Levine, grandparents of the children, had removed them from Mexico on June 21, 2000 and brought them to Nashville, Tennessee pursuant to a visitation order issued by a court in Chicago, Illinois. Petitioner March has filed a motion for summary judgment (Docket No. 34), and the respondents have moved to dismiss the case based on several grounds, including the fugitive disentitlement doctrine (Docket No. 51).[1]

### A. *Legal Standard*

Petitioner seeks the return of his children pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that summary judgment may be rendered if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).

This court finds that this type of case is appropriate for resolution by summary judgment. Indeed, the language of the Convention supports resolution by such means. Article 11 provides that a court, when faced with a petition under the Convention, should "act expeditiously in proceedings for return of children." Hague Convention, art. 11. Courts are to place these cases on a "fast track" in order to expedite these proceedings and carry out the purposes of the Convention.

herein only to the extent that they are relevant to the court's ruling.

The language of the Convention also authorizes courts to "take notice directly of the law of, and of judicial and administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Hague Convention, art. 14. *See also* 42 U.S.C.A. § 11605 ("[N]o authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court.")

There is no requirement under the Hague Convention or under the ICARA, 42 U.S.C.A. § 11601 *et seq.*, that discovery be allowed or that an evidentiary hearing be conducted. *See Sinclair v. Sinclair*, 121 F.3d 709, 1997 WL 428897, at *1 (6th Cir. Jul.30, 1997) (unpublished opinion) (citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir.1994)) (finding appellant's argument that the district court refused to hear testimony of two witnesses without merit). *See also Kovacevich v. Kent State Univ.*, 224 F.3d 806, 831–33 (6th Cir.2000). Thus, under the guidance of the Convention and the statutory scheme, the court is given the authority to resolve these cases without resorting to a full trial on the merits or a plenary evidentiary hearing. *See, e.g., Shalit v. Coppe*, 182 F.3d 1124 (9th Cir.1999) (affirming district court's granting of summary judgment in favor of respondent in ICARA case).

**B. *The International Child Abduction Remedies Act***

This petition is brought pursuant to the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C.A. § 11601 *et seq.* (1995). The ICARA was enacted in order to implement the provisions of the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention").[2] Both the United States and Mexico are signatories to this multi-nation treaty.[3] (Docket No. 84, Response to Petitioner's Statement of Undisputed Facts No. 1)

The Hague Convention was adopted by the signatory nations[4] in order "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, Preamble. Actions brought under the Convention are to be resolved as expeditiously as possible. *See* Hague Convention, art. 11 ("The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children.").

Under the Convention, the removal of a child from one country to another country is to be considered wrongful when

> a it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the

2. Convention on the Civil Aspects of International Child Abduction, October 25, 1980, 1983 WL 206353(TIA).

3. The United States originally signed the Convention on December 23, 1981. On April 29, 1988, the ICARA was enacted. The Convention took effect in the United States on July 1, 1988. *See* 53 Fed.Reg. 23608 (1988) (to be codified at 22 C.F.R. pt. 94). The Convention

entered into force for Mexico on September 1, 1991. *See www.hcch.net/e/members.html* (website of the Hague Convention on Private International Law) (visited Sept. 26, 2000).

4. The Convention is in force between the United States and 48 countries. *See http://travel.state.gov/hague list.html* (visited Sept. 26, 2000).

child was habitually resident immediately before the removal or retention; and

 b at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, art. 3.

As the petitioner, March has the burden of showing by a preponderance of the evidence that the removal of his minor children from Mexico was wrongful as defined by the Convention. *See* 42 U.S.C.A. § 11603(e)(1)(A). Once the petitioner meets this burden, then the burden shifts to the respondents to establish "(A) by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies"; or (B) "by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies." 42 U.S.C.A. § 11603(e)(2).

Thus, the person opposing the return of a child must establish:

1) by clear and convincing evidence that there is a grave risk that the return of the child would expose the child to physical or psychological harm; Hague Convention, Article 13b, 42 U.S.C. § 11603(e)(2)(A); 2) by clear and convincing evidence that the return of the child 'would not be permitted by the fundamental principles of the requested

State relating to the protection of human rights and fundamental freedoms'; Hague Convention, Article 20, 42 U.S.C. § 11603(e)(2)(A); 3) by a preponderance of the evidence that the proceeding was commenced more than one year after the abduction and the child has become settled in its new environment; Hague Convention, Article 12, 42 U.S.C. § 11603(e)(2)(B); or 4) by a preponderance of the evidence that [the petitioner] was not actually exercising the custody right at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; Hague Convention, Article 13a, 42 U.S.C. § 11603(e)(2)(B).

*Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir.1993) (*"Friedrich I "*).[5]

## C. *Wrongful Removal or Retention*

The respondents argue that the petitioner cannot carry his initial burden of proof because there has been no wrongful removal or retention of the two minor children. Under the Hague Convention, " 'wrongful removal' refers to the taking of a child from the person who was actually exercising custody of the child" and " 'wrongful retention' refers to the act of keeping the child without the consent of the person who was actually exercising custody." 51 Fed.Reg. 10494, 10503 (1986) (Hague International Child Abduction Convention: Text and Legal Analysis).

In their Answer, the respondents state that the two minor children were not wrongfully removed from Mexico because they "lawfully had physical custody of the Children at the time they were returned to the United States." (Docket No. 22 at 1)

---

**5.** In *Friedrich I,* the Sixth Circuit reversed the district court's denial of the father's petition to return the child to Germany and remanded the matter to the district court on the issue of whether, under German law, the father had custody rights at the time of the child's re-

moval that he was exercising or would have exercised but for the removal. The Sixth Circuit affirmed the district court's subsequent order to return the child to Germany in *Friedrich v. Friedrich,* 78 F.3d 1060 (6th Cir.1996) (*"Friedrich II "*).

Furthermore, the children have not been wrongfully retained in the United States because "[t]hey have remained pursuant to an Order of the Juvenile Court for Davidson County, Tennessee." *Id.* The court finds this argument without merit.

In October 1999, the Circuit Court for Cook County (Chicago), Illinois granted the Levines petition for grandparent visitation, allowing them prescribed times of visitation with the children.[6] (Docket No. 54, Ex. 7) On May 17, 2000, the Circuit Court ordered, in response to the Levines' emergency petition for "catch-up" visitation[7] under the October 1999 order, that "the minor children ... be immediately turned over to the Levines' physical custody for visitation for an uninterrupted period of 39 days ...." (Docket No. 26, Ex. 1(a)). Pursuant to a Letter Rogatory issued by the Illinois court, the respondents were able to secure a Mexican court order to enforce the Illinois visitation order. *See* Docket No. 26, Ex. 2; Docket No. 103. It was on the basis of these orders that the respondents were able to remove the children from their school in Mexico on June 21, 2000.[8]

The respondents did not return the children to their father after the period of visitation because, by that time, they had secured a court order from the Nashville Davidson County Juvenile Court granting them temporary custody of the children (beyond visitation rights) pending a determination on their petition to terminate the parental rights of the father.[9]

On January 21, 2000, the Probate Court for Davidson County had entered judgment by default in favor of the Levines, as

---

6. The October 1999 order was entered after March and the children had been living in Mexico for a number of months. It contemplates the Levines picking up the children in and returning the children to Mexico. It further provides that "[d]uring the children's regular school year, the children shall not miss school during such monthly weekend visitation." (Docket No. 54, Ex. 7)

7. March complied with the visitation in June and July 1999. March states that "the travel was horrendous on the children" and "[a]fter the children suffered a seriously traumatic flight home to Guadalajara by themselves at the end of the July [1999] weekend visitation in Illinois, ... I did not send the children to Illinois for a weekend of grandparental visitation, in a state and place where no one lived, in disregard for my children's health." (Docket No. 40, March Declaration at ¶¶ 58–59, 62, 64) He claims to have consulted an attorney and discontinued the visitation trips based on that legal advice. *Id.* at ¶¶ 62–64.

8. The petitioner has submitted numerous affidavits and documentation supporting his contention that the respondents were not supposed to take the children out of Mexico during the 39 days of visitation, including a warrant for the arrest of the respondents and their son for the kidnapping of the minor children. *See* Docket No. 40, March Declaration, Ex. B. *See also* Docket No. 40, March Declaration, Exs. J–N; Docket No. 38, Carmen Rojas de March Declaration at ¶¶ 35–37, 43; Docket No. 78, Palfrey Declaration at ¶¶ 25–30. The respondents have also submitted numerous affidavits on the issue of whether they were prohibited from removing the children from Mexico on June 21, 2000. *See* Docket No. 84, Ex. 1 (Levines' Affidavit); Docket No. 104 (Chavira Declaration); Docket No. 105 (Ramos Declaration).

The court finds that this factual dispute need not be resolved in order to decide the petitioner's motion for summary judgment because, regardless of whether the children were to be removed from Mexico for the visitation period, the Illinois court order provided that they were to be returned to Mexico at the end of the 39 days of uninterrupted visitation. (Docket No. 26, Ex. 1(a)) The respondents do not claim that any Mexican court order provided otherwise.

9. On July 3, 2000, the Levines filed an Emergency Petition for Custody, Termination of Parental Rights, Guardianship, Finding that the Children are Dependent and Neglected, and for Entry of a Restraining Order in the Juvenile Court of Davidson County, Tennessee. *See* Docket No. 84 at 17.

a discovery sanction, in a wrongful death action brought by the Levines against Perry March for the death of their daughter, Janet Gail March.[10] (Docket No. 54, Ex. 1) Effective May 8, 2000, at the behest of the Levines,[11] Tenn.Code Ann. § 36–1–113(g) had been amended to add, as a ground for the termination of parental rights, the fact that the surviving parent "has been convicted of or found civilly liable for the intentional and wrongful death of the child's other parent or legal guardian."[12] On the basis of this wrongful death judgment and the new amendments, the Levines filed a petition in the Juvenile Court for Davidson County, Tennessee on July 3, 2000 for the termination of Perry March's parental rights and an award of custody of the minor children.[13] *See* Docket No. 54, Levines' Affidavit at ¶ 30.

Under the ICARA and the Hague Convention, custody and visitation rights are to be determined in the courts[14] of the country that is the "habitual residence" of the children. *See* Hague Convention, art. 19; 42 U.S.C.A. § 11601(b)(4). *See also Friedrich II*, 78 F.3d at 1063. The prime purpose of the ICARA and the Convention is to prevent one parent from removing the children from their "habitual residence" and bringing them to the removing parent's residence in order to have the "home court advantage" of a custody determination by a court where the removing party is living. *See id.* at 1064 ("[T]he Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.").

So if Mexico was the "habitual residence" of these children at the time the Levines removed them to Nashville, then it would violate the Convention and federal law for the Davidson County Juvenile Court to determine that their permanent custody should be transferred to their grandparents. The Hague Convention and federal law would mandate that, in the absence of an "exception" to an order of return (to be discussed hereafter), the Levines seek permanent custody of the children in the courts of Mexico. And if that is the case, the temporary custody order of the Davidson County Juvenile Court does nothing to negate the fact that the Levines are wrongfully retaining the children in

10. Janet March disappeared in August 1996, at a time when she and Perry March were having marital problems. (Docket No. 22 at 6, ¶ 2) The Levines believe that Perry March killed her. (Docket No. 54, Levines' Affidavit at ¶ 5) The case has received enormous coverage in the local press, due in part to the fact that Perry March was named the "prime and only" suspect in her murder. *Id.* at ¶ 12.

11. *See* discussion *infra* pp. 854–55.

12. Tenn.Code Ann. § 36–6–106 was also amended to add the following provision: "Notwithstanding the provisions of any law to the contrary, the court has jurisdiction to make an initial custody determination regarding a minor child or may modify a prior order of child custody upon finding that the custodial parent has been convicted of or found civilly liable for the intentional and wrongful death of the child's other parent or legal guardian."

13. In their Answer, the respondents assert that "[b]ecause an American court has exercised jurisdiction over all custody matters involving the Children since October 1996, the American Courts should continue to exercise jurisdiction in the appropriate U.S. forum." (Docket No. 22 at 5) The July 3, 2000 petition was the first petition for a determination of custody (as opposed to visitation) rights of the two minor children in the United States. Therefore, this "continuing jurisdiction" argument is unpersuasive.

14. The Convention contemplates that the family courts of the country of habitual residence will be making these determinations (as opposed to its equivalent of federal courts) because these courts have expertise in these issues. *See Catz v. Chalker*, 142 F.3d 279, 290 (6th Cir.1998).

Nashville after the expiration of their court-ordered 39 days of grandparent visitation.

### D. Habitual Residence

March asserts that Samson and Tzipora were habitual residents of Mexico when they were removed by the Levines. The Levines argue that Illinois is the habitual residence of these children.[15]

The Convention and the enabling legislation do not define "habitual residence." In *Friedrich I*, the Sixth Circuit stated that the concept of habitual residence under the Convention is not to be confused with domicile.[16] Thus, to determine the habitual residence of minor children, "the court must focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich I*, 983 F.2d at 1401. Furthermore, "[o]n its face, habitual residence pertains to customary residence prior to removal." *Id.* Additional guidance is found in *Feder v. Evans–Feder*, 63 F.3d 217, 224 (3d Cir.1995), where the court, relying on *Friedrich I* and *In re Bates*, held that a "child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimitization and which has a 'degree of settled purpose' from the child's perspective." *Feder*, 63 F.3d at 224. *See also Pesin v. Osorio Rodriguez*, 77 F.Supp.2d 1277, 1284 (S.D.Fla.1999) ("Under the Hague Convention, the relevant period of habitual residence is that span of time 'immediately before' the date of the alleged wrongful retention.").

■ Both children were born in Nashville, Tennessee[17] and resided in Tennessee from their births until mid-September 1996.[18] From mid-September 1996 until mid-May 1999, the children lived with their father in Illinois.[19] The children lived in Jalisco, Mexico with March from mid-May 1999[20] until the Levines removed them to

15. In their Motion to Allow Discovery (Docket No. 87), the Levines list sixty-six questions that they believe need to be asked in a deposition of Perry March "in order to develop proof on the issue of whether March and the Children were habitual residents of Mexico." (Docket No. 87 at 4–5) Most of the questions concern the immigration status of March and the children in Mexico. The court finds that, regardless of the answers to these questions, the respondents would still not prevail in their argument that Mexico is not the habitual residence of Samson and Tzipora.

16. Because *Friedrich I* was decided before any courts in the United States had provided guidance on the concept of habitual residence, the Sixth Circuit looked to a British case, *In re Bates*, No. CA 122.89, High Court of Justice, United Kingdom 1989. In that case, the High Court of Justice stated:

It is greatly to be hoped that the courts will resist the temptation to develop detailed and restrictive rules as to habitual residence, which might make it as technical a term of art as common law domicile. *"The facts and circumstances of each case should continue to be assessed without resort to presumptions and presuppositions."*

*In re Bates* at 10 (emphasis added), quoted in *Friedrich I*, 983 F.2d at 1401.

17. Samson was born on August 27, 1990. Tzipora was born on May 17, 1994. (Docket No. 84, Response to Petitioner's Statement of Undisputed Facts Nos. 2–3)

18. The respondents admit that the minor children resided with the petitioner until August 15, 1996, but assert that they were the primary caretakers from August 16, 1996 until September 12, 1996, the period shortly after their daughter (March's wife) disappeared. *See* Docket No. 84, Response to·Petitioner's Statement of Undisputed Facts No. 10.

19. The respondents dispute the exact date that the petitioner moved to Illinois. *See* Docket No. 84, Response to Petitioner's Statement of Undisputed Facts No. 11. The court finds the exact date of the move to Illinois is irrelevant to the analysis of the children's habitual residence.

20. Petitioner states that he left Illinois with his two minor children on May 19, 1999. (Docket No. 40, March Declaration at ¶ 49)

Nashville. Thus, the minor children were present in Mexico for a little over a year prior to their removal by the Levines. This is certainly a long enough period of time to establish habitual residence. *See Feder*, 63 F.3d at 224 (finding six months to be significant period of time for four-year old child to have stayed in Australia in concluding Australia to be child's habitual residence).[21]

■ The most important factor in the analysis is the child's circumstances in the country alleged to be the habitual residence. In August 1999, the petitioner's two children started attending Oak Hill Academy in Ajijic, Jalisco, Mexico. *See Feder*, 63 F.3d at 224 (finding child's attendance at school in Australia to be significant, stating that he was "participating in one of the most central activities in a child's life"). Samson entered the third grade and Tzipora was enrolled in Pre-primary or Kindergarten. (Docket No. 78, Palfrey Declaration at ¶ 4) According to Wayne C. Palfrey, the Director of Oak Hill Academy, "[b]y the end of the school year, both children had obtained a working and useful knowledge of Spanish, and they were successful in their course studies.

Both children were promoted to the next grade." (Docket No. 78, Palfrey Declaration at ¶ 6) March was a member of the Board of Directors of the Oak Hill Academy as a representative of the Tzipora's class. *Id.* at ¶ 9. The children participated in school activities, and March and Carmen Rojas de March [22] were also involved in these activities. *Id.* at ¶¶ 7, 20–21. The children were also involved in extracurricular activities in Mexico. (Docket No. 40, March Declaration at ¶ 72 ("Samson continued with his cello studies . . ., and with horseback riding."), ¶ 73 ("Tzipi danced ballet, and was socializing very well."))

In addition to attending school in Mexico, the children's family situation changed in a way that further demonstrated a degree of settled purpose to their presence in Mexico. In the summer of 1999, March and his children began living with Carmen and her three minor children, Daro, Thomas, and Cinty.[23] After March and Carmen were married in March 2000, Carmen initiated legal proceedings to adopt Samson and Tzipora. *See* Docket No. 38, Carmen Rojas de March Declaration at ¶ 18, Ex. A. *See also* Palfrey Declaration at ¶ 13 (stating that he "enthusiastically recommended

The respondents dispute the date of the petitioner's move to Mexico, asserting that the petitioner has "variously claimed to have left Illinois on either May 19, 1999 or May 22, 1999." (Docket No. 84, Response to Petitioner's Statement of Undisputed Facts Nos. 11–12) The habitual residence analysis does not depend upon the exact date in May 1999 that the petitioner and his children moved from Illinois to Mexico.

21. *See* Dr. E.M. Clive, The Concept of Habitual Residence, JURID. REV., Part 3, 137, 140 (1997) (finding no cases "where a child has been found not to be habitually resident in a country where he or she has lived for a year or more"), quoted in *Mozes v. Mozes*, 19 F.Supp.2d 1108, 1114–15 (C.D.Cal.1998).

22. Palfrey's Declaration refers to this person by the name she apparently took upon her marriage to Perry March. The Levines

throughout refer to her by her name prior to the marriage, Carmen DeLangre, and maintain that the marriage is not a legal one. (Docket No. 84, Response to Petitioner's Statement of Undisputed Facts No. 18) For ease of reference, and not out of any disrespect, this court will sometimes refer to this person as simply "Carmen."

23. *See* Docket No. 40, March Declaration at ¶¶ 83, 100, Exs. F, H; Docket No. 38, (Carmen Rojas de March Declaration at ¶¶ 4, 6) Despite the respondents' contentions about the validity of the marriage, there is no dispute that the petitioner and Carmen DeLangre began living together with the petitioner's minor children and Carmen's three minor children in the summer of 1999.

Carmen's adoption of the children to the Jalisco Family Adoption Agency.").

 The respondents contend that there is a "lack of a settled purpose" in the children's presence in Mexico for a variety of reasons:

"(1) the wrongful removal of the Children from Illinois in the midst of a visitation dispute there, and his wrongful detention of the Children in Mexico . . .; (2) the Children's potentially illegal entry into Mexico; (3) the Children's father's status as a fugitive from at least two criminal warrants for his arrest . . .; (4) March's illegal conduct in Mexico, which subjects him to deportation . . .; and (5) March's willingness to marry Carmen Rojas in violation of Mexican bigamy law . . . ."

(Docket No. 84 at 23) These contentions simply are not relevant for purposes of deciding whether Mexico or Illinois is the habitual residence of the children under the ICARA. First, the cases are clear that there need not be a decision to remain somewhere indefinitely for it to be considered the child's habitual residence. *See Feder*, 63 F.3d at 223–24 (citing *In re Bates*); *Kanth v. Kanth*, 79 F.Supp.2d 1317, 1321 (D.Utah 1999); *In re Ponath*, 829 F.Supp. 363, 367 (D.Utah 1993); *Levesque v. Levesque*, 816 F.Supp. 662, 666 (D.Kan.1993). Second, the "degree of settled purpose" is to be analyzed not from the parent's perspective but from the child's perspective. *Feder*, 63 F.3d at 224. The primary information about the child's perspective comes from the court's own *in camera* interview with the children.

On September 15, 2000, the court interviewed Samson and Tzipora March in chambers with the assistance of a licensed clinical psychologist selected by the court.[24] Samson, who is ten, expressed great enthusiasm for his school in Mexico ("I loved it; it was great."), for Carmen ("She is just wonderful. She's real nice with me and Zippy.") and for living in Mexico ("It's perfect weather all year 'round."). Tzipora ("Zippy"), at age six, was, of course, less articulate. But she loves her house in Mexico, referred to one of Carmen's children as her "little brother," likes her school there, and "especially" wanted to hug Carmen. Both children seemed well-adjusted, bright, responsive and surprisingly unscarred by the turmoil surrounding them for the last four years.

The court also looks to March's own statements about why he moved to Mexico as evidence of his intentions as to his children's presence in Mexico.[25] *See Feder*, 63 F.3d at 224 (focusing on the "parents' present, shared intentions regarding their child's presence" in country). According to March, he moved with his children to Jalisco, Mexico, where his father lives, "for employment, enjoyment and a fresh start." (Docket No. 40, March Declaration at ¶ 28) He states that, "I left Illinois in part because I was unable to earn a sufficient living in Illinois to maintain my children in the manner I was accustomed to and wanted to, for their benefit."[26] *Id.* at ¶ 29. It is clear that the

---

24. No lawyers or parties were present. Each child was interviewed out of the presence of the other. The tape-recording of this interview and the drawing done by Tzipora during it are filed under seal as exhibits to this memorandum.

25. Generally, the cases under the ICARA discuss the intentions of both parents and their "shared intentions" as to the child's presence in a particular country. *See Feder*, 63 F.3d at 224. Given the absence of the mother, only

the father, Perry March, was exercising custody rights, and only his intentions will be evaluated.

26. Perry March practiced with his father-in-law's (Respondent Lawrence Levine's) law firm before leaving Nashville. (Docket No. 40, Ex. C at 4) The firm filed a disciplinary complaint against him on November 17, 1998 with the Tennessee Board of Professional Responsibility, (*Id.* at ¶ 37; Docket No. 84, Ex. 3), that apparently prevented him from being

petitioner's move, at the time that it was made, had a settled purpose. *See Feder,* 63 F.3d at 223 ("Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode . . . . All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.").

The respondents argue that the petitioner should not be allowed to "create a habitual residence for the Children by brazenly refusing to abide by Court orders issued in the United States." (Docket No. 50 at 3) The respondents lose sight of the fact that, at the time the petitioner left Illinois, the issue before the Illinois court was a matter of their visitation rights, not the custody of the children. The issue of grandparent visitation was pending before the Illinois court at the time of the move to Mexico, but it seems clear that March did not move to Mexico "to require litigation of custody matters in the new country." (Docket No. 50 at 4) At the time of his move to Mexico, there was no custody matter to be decided in Illinois, Tennessee, or anywhere else in the United States. The Levines had not yet sought permanent custody of their grandchildren.

The Levines also point to March's assertion to the Illinois court that Illinois has "exclusive personal and subject matter jurisdiction of the parties and the minor Children." *See* Docket No. 84 at 21 (quoting

Docket No. 26, Ex. 5(a) (Emergency Motion for Immediate Turnover of Minor Children, filed July 5, 2000)). In support of this emergency motion, March stated that (1) he has an Illinois driver's license and that is his only driver's license; (2) he has bank accounts in Cook County, Illinois; (3) he is registered to vote in Illinois; and (4) Illinois is where he intends to vote either in person or by absentee ballot. *See* Docket No. 26, Ex. 5(a), March Affidavit at ¶¶ 5–8. The Levines argue that these statements "run contrary to his assertion now that Mexico is the habitual residence of the Children and that questions of custody should be litigated there." (Docket No. 84 at 22)

This argument is without merit. March clearly states in this Affidavit that he has been living in Mexico with his children since May 1999. He asserts that "[e]very United States Citizen is entitled to a State of Citizenship." (Docket No. 26, Ex. 5(a), March Affidavit at ¶ 4) He makes the statements the Levines rely upon in an effort to make the case that, as between Illinois (where he and the children lived from September 1996 to May 1999 and where three years of grandparent visitation litigation took place) and Tennessee (where he and the children have not lived since September 1996), Illinois ought to be the venue in which this, now, custody battle is fought.[27] March's statements in this Affidavit cannot be interpreted to negate his claim that Mexico is the habitual residence of the two minor children.[28]

admitted to the Illinois bar. He never responded to the complaint and, on September 1, 2000, was disbarred from practicing law in Tennessee. (Docket No. 84, Ex. 3)

27. The Illinois court initially agreed with him. On July 6, 2000, that court, *sua sponte* enjoined the Levines "from further proceedings in Tennessee," finding that it had and "retains exclusive subject matter and personal jurisdiction over the minor children." (Docket No. 54, Ex. 9) On July 19, 2000, however, the Illinois court reversed course and de-

clined jurisdiction in favor of the Juvenile Court for Davidson County, Tennessee. *See* Docket No. 84 at 17. This order from the Illinois court has not been provided by the parties, so that court's reasoning is not available to this court.

28. In their Answer, the respondents also raise estoppel and waiver as affirmative defenses, based on March's assertion in the Illinois court proceedings that it has jurisdiction over the children. (Docket No. 22 at 5) The affir-

■ The court finds that March has carried his burden of establishing that the habitual residence of the two minor children, Samson and Tzipora, is Mexico.

### E. *Rights of Custody*

■ Under the ICARA, the petitioner must also establish by a preponderance of the evidence that he was exercising custody rights over his minor children in Mexico under Mexican law at the time the children were removed from Mexico. *See Friedrich II*, 78 F.3d at 1064. Article 3 of the Convention provides: "[t]he rights of custody ... may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Hague Convention, art. 3. Once the court finds that the petitioner was exercising custody rights over the minor children, "the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." *Friedrich II*, 78 F.3d at 1066.

Under Mexican law, the petitioner's rights of custody arise by operation of law. One source explains custodial rights in Mexico as follows:

> Deriving from the Roman law and the civil law is the concept of patria potestad, which is the parents' responsibility to care for the child, reside with the child, and provide for the child's necessities, including food, education and development. The patria potestad gives a right to correct the child, the right to control and manage any property or rights the child may have and the right to the child's assistance. By law, the right to patria potestad belongs to both parents, but the exercise of the right, by necessity, normally involves one decision-maker. Concurrence or agreement is not required. Historically, the father had superior rights of the patria potestad, but today it is a joint responsibility. If the parents are deceased or unavailable, the paternal grandparents may exercise the patria potestad. If the paternal grandparents are unavailable, the maternal grandparents may exercise the patria potestad.

Antoinette Sedillo Lopez, *International Law—U.S./Mexico Cross–Border Child Abduction—The Need for Cooperation*, 29 N.M. L. REV. 289, 297 (Spring 1999). *See also* 1996 WL 915784, Código Civil para el Distrito Federal (C.C.D.F.) art. 412 ("An unemancipated minor shall be under the parental authority of any existing parental ascendant, who in turn shall exercise that authority in accordance to Law."); 1996 WL 915790, C.C.D.F. art. 418 ("In the absence of parents, parental authority shall pass to the remaining ascendants ... in the order to be determined by the Family judge, who shall take into consideration the particular circumstances of the case.") [29]

■ Under Mexican law, March, as the natural father of the minor children, was exercising his custody rights at the time the two minor children were removed from Mexico by the Levines.[30]

### F. *Statutory Defenses*

In objecting to the return of the children to Mexico, the respondents raise two statutory defenses under the Hague Convention

---

mative defenses are without merit for the same reasons as stated above.

**29.** The petitioner cites the court to similar provisions under the laws of the state of Jalisco, Mexico. *See* Docket No. 40, March Declaration at ¶ 142, Ex. O.

**30.** Buried in a footnote, the Levines "acknowledge that they do not dispute that March had custody rights to the Children and was exercising custody rights at the time the Levines picked the Children up in Mexico." (Docket No. 84 at 22 n. 4)

and the ICARA.[31] The respondents argue that the minor children should not be returned to Mexico to the custody of the petitioner because (1) there is a grave risk that the return of the minor children to Mexico would subject them to psychological and physical harm and would place them in an intolerable position; and (2) the return of the minor children to Mexico would violate human rights and fundamental freedoms. (Docket No. 22 at 3–4)

### 1. *Grave Risk of Harm*

The respondents raise as affirmative defenses in their Answer their "grave risk" allegations. They assert that a return to Mexico would subject the children to: (1) "psychological harm;" (2) "physical harm in that, among other things, March and his agents have threatened to kill the Levines and members of their family and it is physically unsafe for the Levines or the Children to have child custody matters litigated in Mexico;" and (3) "an intolerable situation in that, among other things, they would be expected to reside with the individual who murdered their mother." (Docket No. 22 at ¶¶ 5–7) They also argue that "March's communications with the Children, his persistent failure to abide by valid court orders, and his other conduct, raise substantial questions about the dan-

ger of physical or psychological harm to the children or to the Levines in the event the Children are returned to Mexico, and as to whether the Children would be placed in an intolerable situation there." (Docket No. 84 at 43) Although they requested the opportunity to take discovery, the respondents have put into this record volumes of evidence in support of their allegations. *See, e.g.,* Docket No. 54 with attached exhibits.

Under Article 13b, a court may decline to order the return of a child if the person opposing the return of the child establishes by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13b.[32] *See also* 42 U.S.C.A. § 11603(e)(2)(A). Article 13 also provides that the court "shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence."

█ It is clear that, in evaluating whether the person opposing the return of the child has established that there is a grave risk of harm, the court is not to make a determination of the child's best

---

**31.** The petitioner has filed a Motion to Strike and Dismiss Respondents' Affirmative Defenses (Docket No. 69), arguing that the respondents, as grandparents, do not have standing to raise affirmative defenses in this action. (Docket No. 69 at 12) This is a case of first impression. The court has not found a single case under the ICARA where the two parties to the action are not the parents of the minor children. While the court disagrees with the petitioner that grandparents may never have standing to raise affirmative defenses in an ICARA case, the court does find the respondents' position in this case to be troubling. This is not a situation where the grandparents removed the children from Mexico under a claim of custody rights. All they had been granted were visitation rights. However,

since a decision on the merits, rather than one based on standing, should advance the ultimate resolution of this case, the court chooses not to base its ruling on the standing issue.

**32.** Article 13 of the Convention also provides that a court may refuse to order the return of a child to the child's habitual residence "if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views." Hague Convention, art. 13. This ground does not favor the Levines. Even if this court were to find Samson mature enough to take account of his views, he does not object, and in fact greatly looks forward, to his return to his father in Mexico.

interest.[33] As stated in the often quoted case, *Tahan v. Duquette*, 259 N.J.Super. 328, 613 A.2d 486, 489 (A.D.1992):

> the Article 13b inquiry was not intended to deal with issues or factual questions which are appropriate for consideration in a plenary custody proceeding. Psychological profiles, detailed evaluations of parental fitness, evidence concerning lifestyle and the nature and quality of relationships all bear upon the ultimate issue. The Convention reserves these considerations to the appropriate tribunal in the place of habitual residence .... No court on a petition for return should intrude upon a foreign tribunal's subject matter jurisdiction by addressing such issues.

Furthermore, "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue." Hague Convention, art. 19. *See also* 42 U.S.C.A. § 11601(b)(4).

In *Friedrich II*, the Sixth Circuit adopted a "restrictive reading" of the "grave risk" exception, stating that "a grave risk of harm for the purposes of the Convention can exist in only two situations." *Friedrich II*, 78 F.3d at 1069. Those situations are:

> First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of

habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Id.*

The cases that have addressed whether the removing parent has established the Article 13b "grave risk" exception by clear and convincing evidence demonstrate that this exception is truly to be narrowly construed. *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 376 (8th Cir.1995).

In *Nunez–Escudero*, the mother, in opposing the return of her child to the father in Mexico, argued that there was a grave risk that the child's return to Mexico would subject him to physical or psychological harm or would place him in an intolerable situation. In support, she submitted evidence that, while in Mexico, she had been physically, sexually and verbally abused by her husband, the father of the child. She also stated that she feared for the child's safety because her husband refused to purchase a car seat for the child. She also offered evidence that her father-in-law was verbally abusive and that she had seen him hit his youngest son. The appellate court rejected the mother's "grave risk" argument, stating "[t]he evidence is general and concerns the problems between [the mother], her husband and father-in-law." *Id.* at 377. In reversing and remanding, the Eighth Circuit instructed the district court "not to consider evidence relevant to custody or the best interests of the child," and clarified that the "Article 13b inquiry must encompass some evaluation of the people and circum-

---

**33.** *See* 51 Fed.Reg. at 10510 ("This [Article 13b] provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests."). *See also Friedrich II*, 78 F.3d at 1068 ("The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence."); *Freier v. Freier*, 969 F.Supp. 436, 442 (E.D.Mich.1996) ("Nor is the Court entitled to decide where the child would be happiest since that is an issue for the custody court to decide.").

stances awaiting that child in the country of his habitual residence." *Id.* at 378.

In an earlier Eighth Circuit case, *Rydder v. Rydder,* 49 F.3d 369 (8th Cir.1995), the court affirmed the district court's determination that the mother had not shown the existence of a "grave risk" by clear and convincing evidence. The mother had pointed to "no specific evidence of potential harm" to the children, relying merely on journal articles that concluded that separating a child from the primary caretaker creates a risk of psychological harm. *Rydder,* 49 F.3d at 373.

In *Tabacchi v. Harrison,* 2000 WL 190576 (N.D.Ill. Feb.10, 2000), the respondent offered evidence of her husband's history of repeated physical and verbal abuse towards her, including incidents where her husband slapped her, hit her on the head, grabbed her and threw her to the ground, allegedly choked her, and hit her in the face with his arm. The court found that, on the two occasions that the child was present during altercations between the parents, the child was not harmed. Furthermore, the court found that the father never struck the child and only yelled at the child, as the mother did, when the child disobeyed. The court found that, based upon the evidence offered by the mother, the primary risk of harm was to the mother and not to the child. While emphasizing that "[the husband's] behavior toward his wife is unacceptable, to qualify as a grave risk of harm under the convention, the risk must be to the child." *Tabacchi,* 2000 WL 190576, at *13.

In *Janakakis–Kostun v. Janakakis,* 6 S.W.3d 843, 850 (Ky.Ct.App.1999), the court found that the respondent had failed to satisfy her Article 13b burden despite her evidence that, during a "violent rage," her husband had pushed her and the child to the floor, that her husband had pulled her hair such that he caused her to be hospitalized with severe neck injuries, that

her husband regularly punished the child by "giv[ing] her a smack on the back," and that her husband had, on one occasion, torn up the child's passport. The respondent had also offered evidence from a psychologist that the child suffered from post-traumatic stress syndrome, had probably been sexually, physically and emotionally abused, and suffered from neglect. Despite this evidence, the court found that "[t]here is absolutely no competent evidence before the Court that [the child] has been abused or neglected by [the father], or that [the child] faces certain danger in Greece. Likewise, there is no evidence that the courts in Greece cannot protect [the child]." *Janakakis–Kostun,* 6 S.W.3d at 850–51.

In *Currier v. Currier,* 845 F.Supp. 916 (D.N.H.1994), the district court held that the return of the children would not place them in grave risk of harm and ordered their return to Germany. The father of the children had argued that their mother was depressed and estranged from her parents, but the court found that "there was no evidence she ever failed the children or placed them in actual danger." *Currier,* 845 F.Supp. at 923. The court noted that "[w]hile this court is required to 'evaluate the surroundings to which the [children are] to be sent and the basic personal qualities of those located there,' the court's focus is limited to the grave risk, if any, that situation seriously presents for the children." *Id.* (citing *Tahan,* 613 A.2d at 486). The court found "no credible evidence raising any serious doubt about the safety, propriety, or nurturing character of the German environment to which the children would return." *Id.*

And finally, in *Steffen F. v. Severina P.,* 966 F.Supp. 922 (D.Ariz.1997), the mother, opposing the father's petition for return of the child to Germany, argued that there was a grave risk of harm because the

father had molested her daughter by a prior relationship. The court rejected the mother's argument, finding that there was no evidence that the child to be returned had been molested. Although the court found that it was "highly probable" that the mother's daughter had been sexually abused in the past, the court found that the mother had not "shown by clear and convincing evidence that [the father] was responsible for that abuse." *Steffen F.*, 966 F.Supp. at 926. Thus, the court could not infer that there was a risk of physical harm to the child if he were returned to the father or that the father was an unfit parent.[34]

Indeed, the few cases that have denied a petition for return on the basis of the "grave risk" exception have generally emphasized that there was clear and convincing evidence to support a finding that the parent seeking the return had seriously abused the child. For example, in *Rodriguez v. Rodriguez*, 33 F.Supp.2d 456, 459–61 (D.Md.1999), the district court denied the petition for return of three children to Venezuela where there was extensive evidence of physical and psychological abuse of the oldest child and the mother by the father who sought the return. In that case, the oldest child, who was 13 years old, testified that his father began to physically abuse him when he was six years old.[35] One such beating caused him to miss a week of school. During another incident, the father kicked the child in the back, hit him with his fists and told him that he could not tell anyone about the beating. The mother also testified about the physical and verbal abuse of the oldest child, including incidents in which the fa-

ther punched him, hit him with a belt, and scratched his face. There was testimony that the father kept handguns in the house and would brandish the guns while drinking. A psychologist testified that the two oldest children and the mother suffered from post-traumatic stress disorder. *See also Blondin v. Dubois*, 78 F.Supp.2d 283, 285 (S.D.N.Y.2000) (*"Blondin III "*) (court denied father's petition for return, finding that father beat the daughter frequently and threatened her life, including incident where father twisted piece of electrical cord around her neck, and had also threatened to throw son out the window); *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir.2000) (court denied father's petition for return, finding, among other things, that father had repeatedly beaten 20–year–old son from prior relationship and younger children had frequently witnessed the father's violent assaults). *But see Panazatou v. Pantazatos*, 1997 WL 614519 (Conn.Super. Sept.24, 1997) (court issued interim decision, pending resolution of undertaking process between the parties, finding that mother had established "grave risk" exception based on testimony that separation of child from mother would cause psychological harm and based on the mother's fears of her husband's anger).

Of some importance to this court on the issue is the fact that, throughout the three years of grandparent visitation litigation in Illinois, the Levines never claimed that March was an unfit parent (Docket No. 40, March Declaration at ¶ 135, Ex. C at 8), nor did they seek custody. The facts supporting their present assertion of grave risk of harm to the children arising out of

---

**34.** The court did find that there would be a grave risk of psychological harm to the child if he were returned to the father because the child had bonded and attached to the mother. *See Steffen F.*, 966 F.Supp. at 927–28. This basis for applying the Article 13b exception is clearly not applicable to this case.

**35.** Although the middle child was not physically abused by the father, this child saw the physical abuse of the mother and her older brother and was "always afraid of misbehaving because she saw what happened to her brother." *Rodriguez*, 33 F.Supp.2d at 460.

the disappearance of their daughter were all known to the Levines throughout this period, yet that allegation was not made. Their struggle centered on visitation rights. Now, however, having secured by default a civil wrongful death judgment against March, who has never been criminally charged in connection with his wife's disappearance,[36] their contention that March killed their daughter somehow has taken on the dimension of child abuse. And they now have a judgment saying he killed her.

On October 30, 1996, Perry March filed a petition in the Probate Court for Davidson County, Tennessee seeking, among other things, the transfer of certain bank accounts held by Janet March to him. The Levines filed an intervening petition as the parents and next friends of Janet March and "as grandparents of the two children" opposing the transfer of any property to Perry March. *March v. Levine,* 1999 WL 140760, at *1 (Tenn.Ct.App. Mar.17, 1999). Although not clear from the record before this court, it appears that, in July 1999, the Levines then filed, as an amended intervening petition, a wrongful death claim against Perry March in the Probate Court, alleging that Perry March had killed Janet March, their daughter. *See* Docket No. 54, Levines' Affidavit, Ex. 1 at 2. March apparently did not cooperate in the discovery phase of that case [37] and, as a discovery sanction under Tennessee Rule of Civil Procedure 37.02(C), the court ordered his answer to the wrongful death claim stricken, found the allegations in the Levines' amended intervening petition alleging wrongful death to be thus uncontested and declared

true and correct, entered judgment by default against March, and precluded him from presenting any testimony as to any defenses to the wrongful death claim contained in the amended intervening petition. (Docket No. 54, Levines' Affidavit, Ex. 1) In the accompanying Appendix to Judgment by Default and Findings of Fact, clearly prepared by the Levines' counsel, the court made twelve "factual findings" based upon no proof, among which were these:

2. Over time, beginning in 1990, Perry March became increasingly physically, verbally, and emotionally abusive toward Janet Levine March....

4. On August 15, 1996, after a heated argument, Perry March intentionally inflicted severe, physical harm and serious bodily injury on Janet Levine March. Perry March's intentional physical assault caused such severe bodily injury to Janet Levine March that she died. As a direct, proximate result of Perry March's violent and brutal act, Janet Levine March died on August 15, 1996 or very shortly thereafter....

(Docket No. 54, Levines' Affidavit, Ex. 1) On February 8, 2000, a jury was empaneled to hear proof on damages only proximately caused by Perry March, "who wrongfully, intentionally, recklessly, maliciously and fraudulently killed his wife." (Docket No. 54, Levines' Affidavit, Ex. 2) On April 25, 2000, a verdict was returned in favor of the Levines individually, as the next friends of Janet Gail March, and as the next friends of the minor children and for their use and benefit, in the total amount of $113,500,000. *Id.* at 3.[38]

---

36. *See* Docket No. 22 at ¶ 15.

37. The court held that Perry March had been "a willfully disobedient party and has willfully disobeyed unambiguous, specific orders of this Court." (Docket No. 54, Levines' Affidavit, Ex. 1)

38. March states that he filed a timely notice of appeal of that judgment on May 2, 2000. *See* Docket No. 40, March Declaration at ¶ 150, Ex. R.

The Levines do not assert that the alleged abuse of Janet March by Perry March that began in 1990 or his alleged killing of her in 1996 took place in front of the children or that those acts were ever known to the children. Instead, they argue that his alleged killing of Janet "has deprived the Children forever of Janet's love, affection, attention, devotion and guidance." (Docket No. 54, Levines' Affidavit at ¶ 5) Much more is required under the case law to establish this exception of grave risk of harm to the children by clear and convincing evidence. *See Tabacchi*, 2000 WL 190576, at *13 (although finding that the petitioner-father had repeatedly physically and verbally abused the respondent-mother, the court found the "grave risk" exception not established because, "under the convention, the risk must be to the child").

The *Walsh* case, relied upon by the respondents for this point, is distinguishable. Most importantly, in *Walsh*, the court was deciding whether to return the children to a *parent* in Ireland or leave them with the other *parent* in Massachusetts. The First Circuit reversed the district court, which did not apply the "grave risk" exception to these facts. The petitioning father, who sought the return of the children to Ireland, had a history of assaults, "bloody and severe," committed upon his wife, his children and other persons, some "much younger than he." *Walsh*, 221 F.3d at 220. He even hauled his eight-year-old daughter into a "bloodied room" to witness the aftermath of a vicious fight with her half-brother and instructed her to tell her half-brother to leave. *Id.* at 210, 222. She was later diagnosed with post-traumatic stress disorder. *Id.* at 211. Nothing approaching these facts has even been alleged in this court by the Levines. And they misconstrue the appellate court's criticism of the district court's giving "insufficient weight to [the father's] chronic disobedience of court orders." *Id.* at 219. The court orders that the father disobeyed in *Walsh* were protective orders, enjoining him from threatening or using violence against his wife or "watch[ing] or beset[ting]" her residence. *Id.* at 210. The district court had ordered the children returned to Ireland with specific "undertakings" agreed to by the father. *See Application of Walsh*, 31 F.Supp.2d 200, 207 (D.Mass.1998). The appellate court apparently had little hope that the father would keep his promises, given his history of disobedience to protective orders. This court is not presented with a remotely similar situation.

The respondents also point to several surreptitiously tape-recorded telephone conversations[39] between March and his children on July 4, 2000 as evidence that there is a "grave risk" that the return of the minor children to Mexico will subject them to physical or psychological harm.[40] It is clear in what is labeled the "1st Conversation" that Perry March had just learned that, the day before, the Levines had filed a petition in the Juvenile Court for Davidson County, Tennessee, seeking permanent custody of the children. They

39. According to the respondents, they tape-recorded the telephone conversations between the two minor children and the petitioner upon the suggestion of a police officer in the Metropolitan Nashville Police Department. *See* Docket No. 84 at 41. Petitioner has filed a Motion to Strike these tape-recorded telephone conversations (Docket No. 112), on the ground that there was no court authorization, he did not consent, and there is no evidence that the two minor children consented. The Levines have responded, asserting that, as guardians of the children, they had sufficient grounds to vicariously consent on behalf of the children under *Pollock v. Pollock*, 154 F.3d 601 (6th Cir.1998). (Docket No. 119) The court finds this argument persuasive and, therefore, has considered these tape recordings.

40. *See* Docket No. 84, Ex. 8 (filed under seal).

also had secured a restraining order allowing the children to remain in the temporary custody of the Levines pending further hearings and enjoining the petitioner, the petitioner's father, Arthur March, and Carmen from all contact with the Levines and the children except "reasonable telephone contact and/or visitation that is strictly supervised by the Department of Children's Services and the Davidson County Police Department." (Docket No. 54, Levines' Affidavit, Ex. 13) March's worst nightmare has come true. (Docket No. 26, Ex. 5(c) at ¶ 11) "I have been telling you all along that when they get you down there they are going to try to file papers to keep you from me forever," he tells Samson. March is desperate and angry.[41] He is frustrated and hurt that Samson did not refuse to be taken from his Mexican school by the Levines and that, at some point, he has told Carmen that he was happy being able to see his friends in Nashville. He sometimes shouts at Samson, but never at Tzipora, with whom he is gentle and loving. This attempt to "steal" his children, coupled with his paranoia about what he perceives to be the boundless power and influence of the Levines (replete in the papers filed in this case) has driven him to the breaking point. He is demanding, abusive and controlling of Samson who, throughout, amazingly seems able to communicate an alliance with his father without really turning against his grandparents. It is these conversations that caused the court to conduct the *in camera* interviews with the children, a practice not uncommon in Hague Convention cases. *See Sheikh v. Cahill,* 145 Misc.2d 171, 546 N.Y.S.2d 517, 521–22 (N.Y.Sup.Ct.1989); *In re Nicholson v. Nicholson,* 1997 WL 446432, at *3–4 (D.Kan. July 7, 1997) *See also* Rania Nanos, The Views of a Child: Emerging Interpretation and Significance of the Child's Objection Defense under the Hague Child Abduction Convention, 22 BROOK. J. INT'L L. 437 (1996).

Samson was interviewed first. He seemed happy, relaxed and forthcoming.[42] Samson appears to like all aspects of his life in Mexico (with the possible exception of having to wear a uniform to school). He has learned the Spanish language and likes to speak it, he likes his school, the climate, and being with his grandfather, Arthur March, and he loves Carmen and her children. When asked if he is having nightmares, he stated that he was beginning to have them because he misses his dad and wants to go back to Mexico. This was the only point in the interview when Samson was close to tears. He stated that nothing about going back to Mexico makes him scared or nervous and that he is not afraid of anything or anyone there. When asked if his father ever hit him, he said only when he and his dad were fooling around. He seems totally unaware of his father's alleged business problems in Mexico and the alleged use of guns by his grandfather or anyone else and substantially unaware of the turmoil surrounding this case. Neither the court nor the licensed clinical psychologist who assisted the court noted signs of deception or causes for alarm during this interview.

---

41. March asserts in these telephone conversations with Samson that Lawrence Levine has not always called Samson to the telephone when March has called. He is certain that someone is listening in on or recording the calls. In one of the calls, someone alerts Carolyn Levine to the fact that Samson is talking to March and with a, "You can't call your dad now," she hangs up the phone.

42. The children did not appear to have been pressured in any way prior to the interview. In the sealed Order scheduling the interview, the court requested that the Levines not let the children know the purpose of the interview. It is clear that they honored that instruction.

Tzipora, who is six, likewise was relaxed during the interview. She can only be described as playful and delightful in every way. Throughout much of the interview, she was drawing a picture of a little girl thinking about hearts. She likes speaking Spanish, loves her house in Mexico, expressed enthusiastic affection for Carmen and referred to Carmen's children as her siblings. She likes living with her grandparents but misses her father. What she would most like is for her father and "especially Carmen" to come here so that she could hug them and her grandmother and grandfather at the same time. She is not afraid of anything here or in Mexico, but did have a scary dream about snakes in Mexico once and a bad dream in Nashville after her brother told her a scary story. She did state that Daddy spanks but her Mommy never did before she went away or died. Again, there were no signs of deception or cause for alarm in her interview.

The court's observations are bolstered by the statements in the Declaration of Wayne C. Palfrey, the Director of the Oak Hill Academy in Mexico.[43] Mr. Palfrey states that both children "did very well in school" and "were enjoyable, happy and engaging students." (Docket No. 78, Palfrey Declaration at ¶ 5) They "obtained a working and useful knowledge of Spanish, and they were successful in their course studies."[44] *Id.* at ¶ 6. Mr. Palfrey "consistently observed" the children in the presence of March and Carmen, who "had a constant dialogue with the children's teachers, and was very aware of their needs and schedules." *Id.* at ¶¶ 10,12. He states that Perry March was "concerned about his children's integration into the

school," "highly attentive to his children and engaged in their progress and activities." *Id.* at ¶¶ 7–8. He continues that the children had "a very strong bond to Carmen and their father" and that he "enthusiastically recommended Carmen's adoption of the children to the Jalisco Family Adoption Agency." *Id.* at ¶¶ 13–14. Of particular relevance to the "grave risk of harm" inquiry are these observations made by Mr. Palfrey:

14. The children's school records do not reflect any abuse, neglect or negative treatment by either Perry or Carmen. There was never any Mexican government investigation of maltreatment or abuse of the children, to our knowledge.

15. I have no reason to believe, and no knowledge of any facts to indicate, that the March children were the subject of any physical or psychological abuse, or were in any danger here at all. Their family situation here in Jalisco was, to my knowledge, and the knowledge of my staff, loving, normal and happy.

16. To my knowledge, Sammy and Tzipi had a normal social life, and we never received any reports from the families of other students reflecting adversely on the March children or their parents.

17. We are aware that the children took vacations as a family.

*Id.* at ¶¶ 14–17. Mr. Palfrey states that he "personally asked the Levines to allow the children to finish their last three days of school, and the Levines refused me." *Id.* at ¶ 24.

Pursuant to 22 C.F.R. § 94.6(f)[45] and in the interest of evaluating "the surround-

---

43. The court requested and received verification from the State Department that this filing is the authentic declaration of Mr. Palfrey and was signed by him. (Docket Nos. 100–101)

44. In his interview, Samson indicated that he did not know any Spanish before he moved to Mexico.

45. 22 C.F.R. § 94.6(f) provides that the National Center for Missing and Exploited Chil-

ings to which the child is to be sent and the basic personal qualities of those located there," see *Tahan*, 613 A.2d at 489, this court requested through the United States State Department that the Mexican social service agency conduct a home study of the Perry March home, including Carmen and her children. (Docket Nos. 122–23) This request was made on August 11, 2000, eight days after the filing of this case. No direct response has come to that request but, on August 28, 2000, the court was furnished [46] with the substantial equivalent of what was requested, apparently completed in connection with Carmen's application to adopt the children.[47] The report was written on August 14, 2000 by Maria Elena Rivera Hernandez, a social worker, and Abraham Beltran Alatorre, Deputy of the Children and Family Defense General Attorney, both of the Chapala DIF System,[48] after these two individuals conducted a home visit at the March residence. These individuals state that the March children "lived a harmonious and normal life with their parents, Mr. Perry A. March and his wife, Mrs. Carmen Rojas de March." (Docket No. 30) Noting that Carmen's three children also live at the residence, they state, "All of them made up the family, all were in good health and protected by the parents, and enjoyed the safety of the Sub–Division they lived at which has private security." *Id.* The report continues, "It has been observed that the children have always received family orientation, additionally to the love of their father and that of Mrs. Carmen Rojas. Likewise, the parents' behavior is good; this agency has not received [any] claim as to the opposite nor regarding mistreatment of the children." *Id.*

The court's *in camera* interviews with the children, the Declaration of Mr. Palfrey and the social services report are all in stark contrast to the picture of life in Mexico for the March children painted by the Levines in their filings with this court. The joint Affidavit of the Levines and its exhibits (Docket No. 54) contain most of what they allege, although their assertions are repeated throughout their papers.

According to the Levines, March is engaged in shady business dealings and living in a bigamous relationship with Carmen. He and his gun-toting father have threatened the Levines, their family and lots of other people. Numerous arrest warrants have been issued in Mexico, and he and the children are about to be deported from Mexico.

March, of course, disputes most of this. He claims that his troubles in Mexico began in 1999 when anonymous packages of video news clips and newspaper clippings about his allegedly killing his wife started arriving in the town where he lives. Letters of complaint against him were filed with immigration officials, requesting he be expelled from the country. March lays all of this at the feet of the Levines, whom

---

dren shall "[u]pon request, seek from foreign Central Authorities information relating to the social background of the child . . . ."

46. The report was submitted to this court by Henry Segura of the National Center for Missing and Exploited Children, which works closely with the State Department in these cases. He received it from Rosa Isela Guerrero Alba of the Mexican Central Authority for Child Abduction. (Docket Nos. 29–30) The respondents have not challenged the au-

thenticity of this report or the certified translation submitted with it.

47. The court was informed of this fact by Ms. Marty J. Haas of the United States State Department in a telephone call on September 12, 2000.

48. The DIF System refers to the Municipal System of Family Whole Development, seemingly the equivalent of our social services department.

he claims stirred up all the trouble and "poisoned the well" in his new home with their accusations. *See* Docket No. 40, March Declaration at 14–17.

This court has twice requested information from the U.S. State Department about the alleged deportation proceedings against Perry March. (Docket Nos. 124–25) No information has yet been forthcoming. This court, in its *in camera* interview of Samson, asked him about the presence of guns in Mexico. He stated that he had not seen any guns. Whatever business problems March may be having, whether or not the Levines have contributed to them, have had no effect on the children, so far as this court can determine.

The Levines have submitted copies of three criminal complaints lodged against March in Mexico. *See* Docket No. 90. Ms. Tove Lindemann Midtun alleges in the first one, filed December 3, 1999, that March threatened her life "through a close friend" for defaming him and spreading information she had no knowledge of. (Docket No. 90, Ex. 1) March claims that (1) Ms. Midtun is an "agent/friend of the Levines;" and (2) he provided alibi information to the authorities and the complaint was dismissed. (Docket No. 40, March Declaration at ¶¶ 106–7) The second complaint was lodged by Peggy Jo Turner on April 14, 2000. She alleged that, on January 14, 2000, when she was at Perry March's office on business, he threatened to "take care of her" if she did not "shut her mouth." (Docket No. 90, Ex. 2) The third complaint was filed by Joel Nelson Rasmussen on August 21, 2000. He alleges that, on August 20, 2000, after he attempted to serve papers on March while March was eating at a restaurant with Carmen and her children, March drove past him and gestured a "death threat" by drawing his finger across his throat. (Docket No. 90, Ex. 3) March has filed a copy of an assault complaint he has filed

against Mr. Rasmussen in connection with the events on August 20, 2000, in which he claims Rasmussen attacked him and Carmen in front of Carmen's children. (Docket No. 40, March Declaration at ¶¶ 144–45, Ex. Q) March maintains that Turner and Rasmussen are among the Levines' "agents" who were "constantly trying to cause us problems, calling me 'killer,' following Carmen, taking pictures of all of us." *Id.* at ¶ 103.

None of these complaints alleges anything improper taking place in the presence of the March children. The March children do not appear to be aware that there are arrest warrants out for their father. None of these complaints has yet resulted in the arrest of Perry March. There is an arrest warrant outstanding for the Levines as well in Mexico, secured by March, on the charge of kidnapping his children. (Docket No. 40, Ex. B) The court cannot find that these outstanding criminal complaints establish by clear and convincing evidence a grave risk of harm to the March children, should they be returned to Mexico.

The Levines also rely on the Report of Guardian ad Litem Redina Friedman, a lawyer appointed by the Chicago court to represent the March children. (Docket No. 54, Ex. 10) Her report was filed July 19, 2000, after the Levines had filed papers in the Davidson County Juvenile Court seeking custody of the March children. Ms. Friedman's report urges the Chicago judge to cede jurisdiction to the Davidson County court, since the Levines and the children (now) are there, and March no longer lives in Illinois. Ms. Friedman states that she has spent "approximately 8 hours with the children and the LEVINES in Tennessee" and "believe[s] that PERRY is emotionally abusing the children and is an unfit parent." (Docket No. 54, Ex. 10 at 3) She states that March has "recently"

enrolled the children in a private school in Mexico, *Id.* at 4, which, according to the undisputed evidence, is inaccurate. She states that the March children "do not seem particularly bonded with [Carmen's] children as step-siblings" and do not express their love for Carmen or the fact that they miss her "of their own volition." *Id.* These impressions are totally at odds with this court's impressions formed during the *in camera* interviews with the March children. Ms. Friedman, who is a lawyer, not a psychologist or social worker, does not state that she ever spoke to the children out of the presence of the Levines, as did this court, and it is clear that no licensed clinical psychologist was present with her to pick up cues regarding deception or psychological disturbance not obvious to a layperson, as was the case with this court's interview. The court must view Ms. Friedman's report as unduly influenced by the Levines and gives it little weight.

Even if this court were to find that the Levines established the grave risk exception, much of the case law under the Hague Convention would mandate the return of the children to their father in Mexico anyway.

In *Blondin v. Dubois*, 189 F.3d 240 (2d Cir.1999) ("*Blondin II*"), the Second Circuit held that, while there was evidence that supported the district court's factual determination that returning the children to the father's custody would expose them to "grave risk" of physical harm, remand to the district court was necessary for further consideration of the possible remedies that would allow the children to be returned to their habitual residence and ensure their safety while the court in the country of the children's habitual residence made a custody determination.[49] *See also Friedrich II*, 78 F.3d at 1067 ("[A] federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention."); *Walsh*, 221 F.3d at 219 ("A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings."); *Turner v. Frowein*, 253 Conn. 312, 752 A.2d 955, 974 (2000) (although court found that there was sufficient evidence that the father had sexually abused son, court remanded to trial court and ordered trial court to "consider the range of placement options and enforceable remedies that might facilitate the child's safe return pending a custody award in due course by the home court with proper jurisdiction").

On March 21, 2000, respondent Lawrence Levine addressed the Tennessee House of Representatives Committee on Children and Family Affairs[50] concerning

---

**49.** On remand, the district court again concluded that the return of the children to the father in France would present a grave risk of exposure to physical or psychological harm. The court found that the French courts could not adequately protect the children and observed that there was "attempted intimidation of [the mother] and this Court by the French authorities." *Blondin III*, 78 F.Supp.2d at 297. This case is clearly distinguishable. The district court in *Blondin III* found that the father had physically abused one of the children, that this child suffered from an "acute, severe traumatic disorder" as a result of the father's physical and verbal abuse of her and her mother, and that this child objected to being returned to her father in France. In the March case, there is no evidence of physical abuse of the children by March, and Samson does not object to being returned. Furthermore, there is no indication in the record that the Mexican courts or governmental agencies would be unwilling or incapable of protecting the children, should that be necessary.

**50.** The committee hearings also indicate that Mr. Levine had previously addressed a House Subcommittee, presumably the Subcommittee on Domestic Relations.

certain proposed amendments to Tennessee law.[51] When asked by the chair of the committee why this bill was needed, Mr. Levine stated, "Janet March was murdered by her husband and we've got a civil judgment stating that he wrongfully and intentionally murdered my daughter. My grandchildren are living with the murderer right now down in Mexico and, if by some miracle they were ever to come back to the State of Tennessee, I would like the law to be very clear that I have a right to come and ask to take away their custody from the murderer."[52]

Mr. Levine's statements in this legislative committee meeting are revealing of the motivation behind the Levines' attempt to persuade this court that the return of the children to their father would subject them to a serious risk of harm. At bottom, the serious risk of harm to these children, in the eyes of the Levines, is that they are being raised by the man they firmly believe murdered their daughter. To the Levines, being raised by a father whom the Levines believe to be a murderer is as abusive to these children as regular beatings or sexual abuse would be. This is not difficult to understand; indeed, surely most grandparents, believing what the Levines believe to be true, would feel the same way. However, this allegation does not meet the high standard required under the Hague Convention.

The Levines have not carried their burden of establishing a serious risk of harm to these children by clear and convincing

evidence under the Hague Convention or the cases decided pursuant to it. Therefore, if the remaining grounds upon which the Levines rely are not sustained by this court, it is the courts of Mexico, the habitual residence of the March children, to which the Levines will have to apply if they wish to seek custody of their grandchildren.[53]

### 2. *Human Rights and International Freedoms*

The respondents also seek to establish that the minor children should not be returned to Mexico, the children's habitual residence, because to do so would violate "human rights and international freedoms." (Docket No. 22 at 5) Specifically, the respondents assert that

> [g]iven the death threats to the Levines, March's killing of Janet, and March's threats to others in Mexico, it is unsafe to try this case in Mexico. Due process and a fair trial are fundamental principles of the United States of America relating to the protection of human rights and international freedoms. The Levines cannot receive due process or a fair trial in Mexico, largely because of March's conduct.

*Id.*

Under Article 20 of the Hague Convention, "the return of the child ... may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."

---

**51.** In his Petition, March alleged that the Levines "persuaded" the General Assembly of Tennessee to enact into law the "March amendments" to Tenn.Code Ann. §§ 36–1–113 and 36–6–106. (Docket No. 1 at ¶ 40) In their Answer, the Levines admitted that these laws were passed "without a single dissenting vote" but denied that they were instrumental in the passage of these amendments. (Docket No. 22 at ¶ 40) The legislative history reveals otherwise.

**52.** Hearing on HB 2644 before the House Committee on Children and Family Affairs, 101st General Assembly, 2d Reg. Sess. (Tenn. 2000) (statement of Lawrence E. Levine).

**53.** Hague Convention, art. 19; 51 Fed.Reg. at 10511, Section III. J.1 ("[O]nce the factual status quo has been restored, litigation concerning custody or visitation issues could proceed. Typically this will occur in the child's State of habitual residence.").

Hague Convention, art. 20. There is little case law in the United States focusing on this provision. However, the State Department explains that "it should be emphasized that this exception, like the others, was intended to be restrictively interpreted and applied, and is not to be used, for example, as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed." 51 Fed.Reg. at 10510. *See also* Elisa Perez–Vera, Explanatory Report: Hague Convention on Private International Law 426, 462 ¶ 118 (1981)[54] ("[S]o as to be able to refuse to return a child on the basis of this article, it will be necessary to show that the fundamental principles of the requested State concerning the subject-matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles.").

In *Freier*, the court granted the father's petition, finding that the mother's removal of the minor child from Israel was wrongful under the ICARA and, among other things, the return of the children would not violate the fundamental right to travel under the United States Constitution of either the mother or the minor child. Although the father had secured an injunction prohibiting the mother from leaving Israel until the divorce and custody proceedings were settled, the court found that the mother had a due process right under Israeli law to challenge the injunction. The court rejected the mother's argument

that the return would violate Article 20 of the Convention because it was satisfied that the mother's "human rights and fundamental freedoms are not in jeopardy and are protected by the due process available in the civil and Rabbinical courts of Israel."[55] *Freier*, 969 F.Supp. at 444.

 Here, the respondents have not pointed to any action by the Mexican government or the courts that demonstrates that they would be denied due process of law or would be denied a fair trial if the children are returned to Mexico. Indeed, it appears to the court that the respondents have been able to negotiate the Mexican legal system fairly well in that they were able to secure a court order to enforce the Illinois visitation order and even got a judge to accompany them to the children's school to enforce it. (Docket No. 85 at ¶¶ 3–5) There is no clear evidence that the rights of the Levines or, more importantly, the rights of the minor children, would not be protected in Mexico. The court, therefore, finds that the respondents have failed to satisfy their burden.

### G. *Fugitive Disentitlement Doctrine*

The respondents have moved to dismiss March's petition on the basis of the "fugitive disentitlement doctrine". (Docket No. 51) The respondents argue that March is not entitled to bring this petition because he is "a fugitive from at least two arrest warrants arising out of criminal contempt orders issued in the Probate Court for Davidson County, Tennessee and the Circuit Court for Cook County, Illinois . . . ." (Docket No. 52 at 1).

**54.** Elizabeth Perez–Vera, Explanatory Report: Hague Convention on Private International Law (1981) obtained at *www.hcch.net*. The Perez–Vera Report served as "the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." 51 Fed. Reg. at 10503.

**55.** In reaching this conclusion, the court noted that it had focused on the mother's rights "even though it is not clear that the Hague Convention's focus under Article 20 is on the parents' rights as opposed to the child's rights." *Freier*, 969 F.Supp. at 444. The court was satisfied that the minor child's due process rights would be protected in Israel.

The history of these contempt orders in the various proceedings is as follows. On October 18, 1996, approximately a month after March moved with the children to Illinois (Docket No. 40, Ex. C at 2), the Levines filed a petition for grandparent visitation under the Illinois Marriage and Dissolution of Marriage Act in the Circuit Court for Cook County (Chicago), Illinois. (Docket No. 84, Ex. 4) The Levines were first awarded visitation with the March children on December 11, 1996, but this visitation order was vacated on June 30, 1998. (Docket No. 40, Ex. C at 3) The Appellate Court of Illinois vacated the court's grandparent visitation order, finding that it was issued in violation of March's right to due process and that "the trial court granted the grandparents equal, if not superior, rights to visitation over Perry, their natural father. This is not the intent of the grandparental visitation statute." (Docket No. 40, Ex. C at 18–21) The court further found that "the visitation order interferes with Perry's rights as the natural father and equates the rights of the Levines with those of Perry. The order provides an overly generous visitation schedule to the Levines, Perry's in-laws, based only on their own testimony." *Id.* at 23. The appellate court also vacated the injunction preventing March from removing the children from Illinois, finding that the "required elements of proof were not met" (*Id.* at 27), and vacated the order providing for "personal retention of the case by a specific trial judge" (*Id.* at 28).

The contempt order against Perry March stems from a series of orders that were entered after March had moved to Mexico with his children.[56] The first contempt order was entered by the Circuit Court of Cook County, Illinois on August 13, 1999, holding March "in indirect civil contempt for wilfully violating this court's order of July 6, 1999." (Docket No. 26, Ex. 4(c)) The July 6, 1999 order provided that the Levines were to have telephone contact with the March children, who had been moved to Mexico, and ordered Perry March to provide, at all times, a telephone number for the children. (Docket No. 26, Ex. 6(c)) On August 18, 1999, the court entered an order finding March in "direct criminal contempt" for failing to appear in court as ordered on August 13, 1999 and August 16, 1999 and for failing to have his two minor children appear in court as ordered on August 16, 1999. (Docket No. 26, Ex. 4(d)).

The court does not discount the import of these contempt orders and does not ignore the fact that March left Illinois for Mexico during the pendency of the grandparent visitation proceedings. But the Levines can point to no court order in the Illinois proceeding that prevented March from leaving the state.[57] Moreover, March

---

**56.** On May 28, 1999, when only March's lawyer appeared, with motion to dismiss in hand, for a hearing on temporary visitation, the Circuit Court of Cook County, Illinois, entered an order requiring, among other things, that Perry March appear in court with the children on June 3, 1999. (Docket No. 26, Ex. 1(b)) On June 9, 1999, the Circuit Court for Cook County, Illinois, again entered an order requiring Perry March to produce the children on June 10, 1999, and ordered grandparent visitation, apparently based upon the testimony of the Levines, who "believe that Perry March was responsible for Janet March's death," and some information from the guardian ad litem. (Docket No. 26, Ex. 1(c))

**57.** The Levines rely on the original summons, which states that the parties to any action brought under the Illinois Marriage and Dissolution of Marriage Act are not permitted to remove the children until a final judgment in the action without order of the court or consent of the parties. *See* Docket No. 84, Ex. 4. Despite this "form injunction," on December 11, 1996, the Circuit Court for Cook County, Illinois, entered an order enjoining March from removing the children from Illinois. (Docket No. 40, Ex. C at 3) This injunction

was not in contempt of any court orders at the time he moved to Mexico.

The respondents also contend that "March's tactic of preemptive flight cannot shield March from application of the fugitive disentitlement doctrine." (Docket No. 52 at 9) In support, the respondents rely on cases in which "U.S. appellate courts have held that defendants with proper notice of hearings in on-going litigation cannot flee prior to the hearing and then, as a fugitive, challenge the results of the hearing." *Id.* (citing *Empire Blue Cross and Blue Shield v. Finkelstein*, 111 F.3d 278 (2d Cir.1997) and *United States v. Barnette*, 129 F.3d 1179 (11th Cir.1997)).

These cases are inapposite. In *Finkelstein*, the fugitive civil litigants sought to appeal the judgment entered against them in a RICO and common law fraud action. In *Barnette*, the fugitives sought to appeal the court's finding that they were in civil contempt. Here, the petitioner is not seeking in this ICARA action to challenge the results of a hearing of which he had notice before he moved to Mexico. Before he moved to Mexico, there was a pending grandparent visitation petition. This ICARA action does not seek to challenge any award of grandparent visitation, the

wrongful death award, or the contempt findings in the Probate Court.

The respondents also point to the findings of contempt issued by the Probate Court for Davidson County, Tennessee. Here, the court finds that, although the parties to the probate action and this action are the same, there is little nexus between these cases.[58] *See Ortega–Rodriguez v. United States*, 507 U.S. 234, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993) (holding that there needs to be a connection between fugitivity and the proceedings from which the fugitive is to be disentitled from participating in).

 The finding of contempt by the Probate Court stemmed from the petitioner's failure to return a "cross-stitched baby quilt hand sewn by the mother of Carolyn Levine when she was pregnant with Janet March and the beaded bag and the repairs that were required to be made to furniture of the Levines ...." (Docket No. 52, Ex. 5 at 2) On March 27, 2000, the court found March to "be in further direct contempt of this court for his failure to obey the orders of this Court by his willful, habitual and unjustified failure to perform the acts above enumerated and to deliver the items and do the things he was commanded to do in Order of this Court of July 15, 1998." [59]

---

order was vacated by the Appellate Court of Illinois on June 30, 1998. (Docket No. 40, Ex. C at 28) *See also* Docket No. 84, Response to Petitioner's Statement of Undisputed Facts No. 13 (The Levines admit that in June 1998 the Illinois Court of Appeals reversed and vacated a trial court order which had "prohibited March from leaving Illinois with the Children ...."). Clearly the "form injunction" on the summons is of little import if the trial court felt it necessary to issue a specific one and the appellate court vacated the specific injunction without even referring to the "form injunction" on the summons form.

**58.** The respondents assert that *In re Prevot* demonstrates that no nexus is necessary in an ICARA case. *See* Docket No. 52 at 17. But the court in *In re Prevot* specifically found, after discussing *Ortega–Rodriguez*, that a nex-

us was present. *See In re Prevot*, 59 F.3d at 566–67. *But see Walsh*, 221 F.3d at 215 (finding the Sixth Circuit's analysis "too slim a reed to support so weighty a doctrine").

Regardless, while the court does not find the required connection between the probate matter and this case, there is a sufficient nexus between the grandparent visitation proceedings and this ICARA proceeding, so this doctrine must be discussed.

**59.** There are two earlier contempt findings against the petitioner relating to March's failure to return certain items to the Levines, including the baby quilt and beaded bag. (Docket No. 26, Ex. 4(f)) On July 15, 1998, the court found March in contempt and ordered him to pay legal fees, costs, and moving and transportation expenses incurred by the Levines. *Id.* at 7. On January 20, 1999, the

*Id.* The court ordered March jailed. Again, the court does not take lightly March's failure to follow the orders of the Probate Court. However, to preclude him from bringing this ICARA action as a result of this finding of contempt concerning his failure to return and repair personal property of the respondents is far too harsh.

In *Walsh,* the First Circuit recently addressed the applicability of the fugitive disentitlement doctrine in an ICARA case. The First Circuit denied the father's petition under the "grave risk" exception but declined to apply the fugitive disentitlement doctrine to dismiss the father's petition. In reaching its conclusion, the court relied on the rationales articulated by the United States Supreme Court in *Degen v. United States,* 517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996). In *Degen,* the Supreme Court, in an unanimous decision, held that the fugitive disentitlement doctrine does not permit a court "in a civil forfeiture suit to enter judgment against a claimant because he is a fugitive from, or otherwise is resisting, a related criminal prosecution." *Degen,* 517 U.S. at 823, 116 S.Ct. 1777. As the respondents point out, in so holding, the Supreme Court identified five rationales for the application of the fugitive disentitlement doctrine in civil cases against a fugitive: "1) the risk of delay or frustration in determining the merits of the claim; 2) the unenforceability of the judgment; 3) the compromising of a criminal case by the use of civil discovery mechanisms; 4) the indignity visited on the court; and 5) deterrence."[60] *Walsh,*

221 F.3d at 215 (citing *Degen,* 517 U.S. at 825–28, 116 S.Ct. 1777).

The respondents rely heavily on the Sixth Circuit's opinion in *In re Prevot,* 59 F.3d 556 (6th Cir.1995), decided before the Supreme Court's decision in *Degen,* in which the Sixth Circuit dismissed an ICARA petition under the fugitive disentitlement doctrine. The petitioner in that case, Mr. Prevot, a French citizen, had pleaded guilty to a felony theft charge in Texas. He was given 10 years' probation, provided that he make monthly restitution payments and pay a monthly probation officer's fee. Seeking to avoid his probation obligations, Mr. Prevot left for France with his wife and children in violation of the terms of his probation. At some point, his wife brought the children back to the United States to live. Mr. Prevot then filed a petition under the ICARA for the return of the children to France.

The Sixth Circuit found that the fugitive disentitlement doctrine denied Mr. Prevot the right to bring his ICARA action. But *In re Prevot* is distinguishable and does not control the outcome of this case. In *In re Prevot,* the petitioner had been convicted of a criminal felony charge, he fled "to escape his criminal conviction and other responsibilities to court, probation officers, victim and government . . . ." *In re Prevot,* 59 F.3d at 567. These were important obligations of Mr. Prevot before he left the United States that the Court felt strongly he ought not be able to dodge by leaving the country:

> Because of the unique facts, the core of this case is not custody, or competing

court found March in contempt and ordered him to pay a fine of $50.00 per day, beginning January 5, 1999. (Docket No. 26, Ex. 4(g))

**60.** In a post-*Degen* case, the Seventh Circuit characterized the rationales advanced in *Degen* as "shift[ing] the emphasis from considerations of dignity, deterrence, respect, pro-

priety, and symmetry found in a number of earlier [fugitive disentitlement] cases . . . to the kind of practical considerations that inform the decision whether to dismiss a suit with prejudice as a sanction for mistakes, omissions, or misconduct." *Sarlund v. Anderson,* 205 F.3d 973, 974 (7th Cir.2000).

interests of parents, but fundamental concerns of how the United States operates its courts and how those courts may react to abuses of American criminal process, to defiance of judicially-imposed obligations owed to victims of crime, and to flights from financial responsibilities to our government.

*Id.* at 566.

Furthermore, this court agrees with the reasoning in *Walsh* that "applying the fugitive disentitlement doctrine would impose too severe a sanction in a case involving parental rights." *Walsh,* 221 F.3d at 216. Relying on the Supreme Court's recent decision in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000),[61] the court affirmed that "[p]arenthood is one of the greatest joys and privileges of life, and, under the Constitution, parents have a fundamental interest in their relationships with their children." *Id.* (citing *Troxel,* 120 S.Ct. at 2060) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty inter-

ests recognized by this Court.").[62] The First Circuit continued, "[t]o bar a parent who has lost a child from even arguing that the child was wrongfully removed to another country is too harsh. It is too harsh particularly in the absence of any showing that the fugitive status has impaired the rights of the other parent." *Walsh,* 221 F.3d at 216. The other party here is not the other parent, and March's absence from this country has worked entirely in favor of the Levines, who have gotten numerous courts to grant unopposed relief in their favor on a variety of issues.

The rationales cited in *Degen* for the application of the fugitive disentitlement doctrine do not apply to this case. First, the risk of the unenforceability of a judgment is not an appropriate consideration in this case. The respondents argue that the subject at issue—two small children—are presently in the United States and subject to the full protection of our courts. If the custody case[63] is tried in the United States, March will

61. In *Troxel,* the paternal grandparents petitioned for visitation with children after the death of the children's father under the state of Washington's statute that allowed "any person" to petition the state court for visitation, which would be ordered if the court found that visitation would serve the best interests of the child. A plurality of the Supreme Court held that the statute as applied violated the due process rights of the mother because the court granted the paternal grandparents court-ordered visitation in excess of what the mother deemed to be appropriate, based on the court's disagreement with the mother as to whether the increased visitation with the paternal grandparents would benefit the children.

62. *See also* cases cited in *Troxel,* 120 S.Ct. at 2060, emphasizing the nature of the liberty interest of parents in the care, custody, and control of their children, including *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (liberty interest includes

the right of parents to "establish a home and bring up children" and "to control the education of their own"); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (liberty interest includes the right "to direct the upbringing and education under their control"); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) ("it is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

63. The respondents claim that March is a fugitive based on the fact that he moved to Mexico during the pendency of their petition for grandparent visitation. It is they who have upped the ante. Only after they removed the children to Nashville under a visitation order did they file a petition for termination of March's parental rights and custody. There is a world of difference between grandparent visitation and custody.

receive the full panoply of due process, and, no matter who prevails, the courts will be able to enforce their judgment and award the children to the proper party. If the children are sent to Mexico, the United States courts have no control over the proceedings to ensure justice.

(Docket No. 52 at 12) This court has faith that Mexico, the children's habitual residence, is as capable as the United States to enforce a judgment in any custody proceeding.

Next, the court must consider whether the fugitive disentitlement doctrine should be applied in this case to protect the dignity of the court. In *Degen*, the court was confronted with "the spectacle of a criminal defendant reposing in Switzerland, beyond the reach of our criminal courts, while at the same time mailing papers to the court in a related civil action and expecting them to be honored." *Degen*, 517 U.S. at 828, 116 S.Ct. 1777. Yet the Court held that striking his claims and entering summary judgment against him was too severe a sanction. The "criminal defendant" in *Degen* had been indicted by a federal grand jury for distributing marijuana, laundering money and "related crimes." *Id.* at 821, 116 S.Ct. 1777. The Court allowed him to contest from afar the civil forfeiture action brought against him in connection with the very criminal charges he refused to return to face. If those facts do not offend the Supreme Court's sense of protecting the dignity of the court, the facts of this case cannot be found to do so.

The risk of delay or frustration in determining the merits of the claim is something the respondents have brought upon themselves. Instead of seeking custody of the March children in the courts of Mexico, as the Hague Convention dictates, they chose to retain them in Nashville and exploit their "home court advantage."

The fourth rationale articulated by the *Degen* court is whether a criminal case might be compromised by the fugitive's participation in the civil action. *See Degen*, 517 U.S. at 825–26, 116 S.Ct. 1777. In *Degen*, the government was concerned that the fugitive "might use the rules of civil discovery in the [civil] forfeiture suit to gain an improper advantage in the criminal matter, prying into the prosecution's case in a manner not otherwise permitted." *Degen*, 517 U.S. at 826, 116 S.Ct. 1777. Reliance on this rationale is misplaced. Degen had been indicted before he became a fugitive. *See id.*, 116 S.Ct. at 1779. *See also Walsh*, 221 F.3d at 209 (Walsh was arraigned on a two-count criminal complaint, charging him with attempting to break and enter and threatening to kill another, before he became a fugitive); *In re Prevot*, 59 F.3d at 559 (Prevot pleaded guilty to theft charge and was sentenced to 10 years' probation prior to becoming a fugitive). The petitioner in this case has not been indicted for the killing of Janet Gail March. While there may be an ongoing criminal investigation into her death, it would not be appropriate for this court to apply the fugitive disentitlement doctrine where there has been no showing that the petitioner has been indicted. The court will not prevent the petitioner from asserting a claim in the court for the return of his minor children on the basis that he may, at some undisclosed future date, be indicted for the killing of his wife.[64]

Finally, the court must evaluate whether application of the fugitive disentitlement

---

64. Even if the petitioner had been indicted, the court could decline to bar the petitioner from making his claim in court and, instead, take such actions as managing the discovery in the civil action in order not to jeopardize the criminal case. *See Degen*, 517 U.S. at 826–27, 116 S.Ct. 1777.

doctrine would be appropriate in order to deter individuals from becoming fugitives from justice. *See Degen,* 517 U.S. at 828, 116 S.Ct. 1777. This court finds that disentitlement "is too blunt an instrument for advancing" this interest. *Id.* As the Supreme Court stated,

> [i]t remains the case, however, that the sanction of disentitlement is most severe and so could disserve the dignitary purposes for which it is invoked. The dignity of a court derives from the respect accorded its judgments. That respect is eroded, not enhanced, by too free a recourse to rules foreclosing consideration of claims on the merits.

*Id.* Accordingly, the court finds that the rationales as advanced by the Supreme Court in *Degen* would not be advanced by application of the fugitive disentitlement doctrine in this case.

### CONCLUSION

The court grants Petitioner March's petition for the return of his two minor children, Samson Leo March and Tzipora Josette March, to Mexico. As mandated by 42 U.S.C.A. § 11607(b)(3), the respondents are ordered to pay all costs associated with the return of the children to Mexico, court costs and March's reasonable attorney's fees.

An appropriate Order will enter.

### *ORDER*

Pursuant to the accompanying Memorandum, it is hereby **ORDERED** that the Respondents, Lawrence E. and Carolyn R. Levine, are to immediately return the minor children Samson Leo March and Tzipora Josette March to the Petitioner, Perry A. March, who is residing in Mexico. The children are to be flown, at the expense of the Respondents, to the Guadalajara, Mexico airport in the company of a family friend or lawyer to the Levines. No family member of the Levines is to accompany the children to Mexico. The Levines shall give written notice of the date, flight numbers and arrival time to the Petitioner through his counsel, with a copy furnished to the court **UNDER SEAL** 24 hours in advance of the arrival of the children in Mexico. The Petitioner, Perry A. March, shall meet his children at the arrival gate for the designated flight, and custody is to be given to him at that time.

Recognizing that immediate return of the children to Mexico may effectively moot any appeal from this Order, this court, in aid of appellate jurisdiction, hereby stays the effect of this Order until 5:00 p.m. CDT on Tuesday, October 10, 2000, at which time it shall become effective, unless stayed or otherwise modified by the United States Sixth Circuit Court of Appeals. If it is not stayed by that day and time, the children are to arrive at Guadalajara airport by 10:00 p.m. on October 12, 2000.

It is so **ORDERED.**