Simona Oana OLSON, Petitioner,

v.

Oliver William OLSON, Respondent.

No. 3:13–cv–00138

United States District Court,
M.D. Tennessee, Nashville Division.

Signed 07/02/2013

C. Suzanne Landers, Lucie K. Brackin, The Landers Firm, Memphis, TN, for Petitioner.

Rebecca K. McKelvey, Stites & Harbison, PLLC, Nashville, TN, for Respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEVIN H. SHARP, UNITED STATES DISTRICT JUDGE

This matter arose upon the Petition for Return of Children pursuant to the Hague Convention on the Civil Aspect of International Child Abduction (the "Hague Convention"), and the implementing legislation in the United States, the International Child Abduction Remedies Act ("ICARA"), set forth in 42 U.S.C. § 11601, *et seq.*

Petitioner Simona Oana Olson requests this Court to enter an Order directing that the parties' minor children, L.S.O. and S.M.O., be returned to Hungary. She alleges that the children's father, Respondent Oliver William Olson, failed to return the children to the sovereign nation of Hungary on or about September 20, 2012, and has wrongfully retained them in the United States. (Docket Entry No. 1, Verified Petition). Petitioner also claims that she has rights of custody of the children under the law of Hungary in that she is their natural mother and is married to Respondent; and that she was actually exercising these rights within the meaning of the Hague Convention at the time of their wrongful retention. (*Id.* at 7).

Respondent contends that Petitioner consented to the travel of the children to the United States and subsequently acquiesced to the children's stay in Tennessee. (Docket Entry No. 54 at 45). Petitioner retorts that she did not consent to the removal of the children from Hungary to reside in Tennessee, but only to their travel to the United States for a visit with their paternal grandparents; and that she did not acquiesce to their retention in Tennessee, but immediately took steps to obtain their return pursuant to the Hague convention. (Docket Entry No. 1 at 7–8).

The Court held a bench trial in this matter on May 21–23, 2013, after which the parties were instructed to file post-trial briefs. Those briefs were filed on June 13, 2013.

Having reviewed the parties' post-trial briefs, the record, the exhibits received in evidence, and the testimony of the witnesses, after considering their interests and demeanor, the Court enters the following Findings of Fact and Conclusions of Law. Except where the Court discusses different testimony on a specific issue, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts, which it deems to be immaterial to the issues presented. To the extent the testimony of Respondent was contradicted by the testimony of Petitioner, the Court finds that Respondent, in general, was not a credible witness. The credibility determination is based upon the inconsistencies between his testimony and certain actions surrounding his trip to the United States, his explanation of the subsequent filing of divorce based on a single email from Petitioner, and his demeanor and evasiveness while testifying.[1]

## I. FINDINGS OF FACT [2]

Petitioner and Respondent married in

---

1. The Court generally observed similar evasiveness from Petitioner while testifying. At times, Petitioner's responses went beyond evasive and were discourteous to both counsel and the Court.

2. The redacted trial transcripts may be found at Docket Entry Nos. 47–49.

1996 in Bucharest, Romania.[3] The parties moved to Visalia, California, approximately a month-and-a-half later to be close to Respondent's parents. In September 1999, while living in Dallas, Texas, they had twin boys, who are the subjects of this action.[4] Approximately five years later in 2004, the family moved to Budapest, Hungary. According to Petitioner, they moved to Hungary for three reasons: Petitioner wanted to attend dental school, Respondent wanted to get his master's degree, and they wanted to be closer to Petitioner's family in Bucharest, Romania.

The parties purchased a home in approximately 2005, which is located in Budapest, Hungary.[5] The parties and their children resided at 712 Ferenc Korut, Budapest, Hungary, as a family, until 2008, when Respondent took employment in Bucharest, Romania, some eleven to twelve hours drive away from their home. During that time, the couple lived in two different apartments—Respondent lived with Petitioner's sister and her family in Romania, while Petitioner and the children remained at the family home in Hungary. After December 2010, Respondent continued to work in Romania, although he was able to visit Petitioner and the children more often in Hungary, as he had started his own business.

The parties had plans for moving at the conclusion of Petitioner's education in Hungary, so they would be in the same country as a family. Hence, Petitioner decided that she and the children would follow Respondent to Romania.[6] These plans were discussed over a period of several months, and the plan was that the family would go and live with Petitioner's sister temporarily until she found a job and was able to provide another home for the family. The children were to attend an English school after Petitioner found a job.[7] Petitioner testified that the parties would homeschool the children in Romania if Respondent was working and if she herself was working, until the children could attend a private English Christian School.

With these plans in mind, the parties entered into a Residential Lease Agreement with David Barnie and Alexis Barnie for a term of one year in June 2012. (Tr. Ex. 6). The lease provided that the tenants were required to give the landlord a written notice thirty days in advance of their moving. The thirty day notice was reciprocal of the landlords in the event they elected to terminate the lease.

In May 2012, Respondent's father purchased plane tickets for the children to return to the United States for a summer vacation.[8] As planned on July 30, 2012, the children traveled from Hungary to the

3. Petitioner is a citizen of both the United States and Romania, and Respondent is a United States citizen.

4. The children have dual citizenship with Romania and the United States. According to Petitioner, the children are permanent residents of Hungary. Although their status remains permanent residents, their cards expired on October 27, 2012, and need to be renewed.

5. Prior to the purchase of this home, the parties rented an apartment for approximately ten months.

6. Petitioner had reservations about the move to Romania. She claims the parties would effectuate a temporary move, to see if she could locate employment. According to Petitioner, they left the bulk of their belongings in Hungary.

7. The children attended a Hungarian school from September 2005 until May 2012.

8. Between 2004, when the parties moved from Dallas, Texas, until the children's trip in July 2012, the children had been to America once in 2009, when they stayed three weeks.

United States in the care of a paternal aunt and arrived in the United States on July 31, 2012. Once in the United States, the children engaged in a summer vacation with their paternal grandparents. The children's tickets took them to Las Vegas, Nevada, and then Visalia, California, to visit the place where Respondent grew up and to meet their great grandmother. Following their stop in California, the children continued to Cottontown, Tennessee, to the home of their grandparents, David Olson and Ilo Olson, where they would stay for the remainder of their visit. The children were to return to Budapest, Hungary on September 20, 2012.[9]

On August 12, 2012, while the children were enjoying their summer vacation, Petitioner and Respondent loaded up a car and moved much of their belongings to Bucharest, Romania. Petitioner had graduated from dental school approximately a month prior to their relocation. Once in Romania, Petitioner applied for her Romanian dental license. The process was finished on November 11, 2012, and she is waiting on her license.

On Friday, September 7, 2012, Respondent purchased a round trip ticket for himself such that he would also leave from Budapest, Hungary, on September 10, 2012, and return to Budapest, Hungary, on September 20, 2012, after retrieving the children from the United States. Respondent left Budapest, Hungary, as planned, on his round trip plane ticket on September 10, 2012. On September 20, 2012, neither the children nor Respondent returned to Hungary.[10]

Between September 17 and 18, 2012, Petitioner sent multiple Facebook messages and tried to call Respondent numerous times during the night. (Tr. Ex. 64). On September 17, 2012, Petitioner sent Respondent an email stating, "you will not come back ... if you do come back, TYou [sic] will move out with rent and I will file for divorce!" (Tr. Ex. 56). Respondent replied by email to Petitioner and agreed that they should divorce. In the email, Respondent advised Petitioner that he was extending the children's stay in America until he and her could reach an agreement on how to proceed with the marriage and divorce.[11]

On or about September 18 or 19, 2012, Respondent met with and retained an attorney, Joe Zanger.[12] According to Re-

9. The children were still enrolled in and scheduled to return to their Hungarian school immediately upon their return from summer vacation on September 20, 2012. They were expected in school the following day, September 21, 2012. The family intended the children would un-enroll from school in Budapest, Hungary, at the beginning of the Fall 2012 school year. The children had not yet said their goodbyes to their Hungarian friends and school teachers at the time they departed for their summer vacation.

10. For the first two to three months after Respondent arrived in the United States, he effectively cut Petitioner off from phone contact with him, and, thus the children. Petitioner did not have "constant telephone contact" with the children until December 2012. Additionally, Respondent monitored Petitioner's Skype contact and emails with the children. Respondent recorded all of the children's Skype calls and video-chats with Petitioner, beginning on September 17–18, 2012, through the date of the trial held in this matter.

11. Respondent claimed to believe Petitioner's threat that if he returned to Romania, Petitioner would take full custody of the children.

12. Unbeknownst to Petitioner, Respondent had sought divorce advice from a Romanian lawyer in the summer of 2012 prior to his departure, and Respondent learned that Romanian law was not helpful to him in a divorce or custody dispute that he was considering. Additionally, the day after he arrived in the United States, September 11, 2012, Respondent opened a U.S. bank account, even

spondent, Zander advised him to file for a divorce, get an *ex parte* order of custody, and request temporary custody of the children. Respondent signed these documents the day of the meeting. On September 24, 2012, Respondent obtained an *Ex Parte* Order of Custody from the Sumner County, Tennessee, Circuit Court. (Tr. Ex. 24). Petitioner received the Complaint for Divorce, the Motion for Temporary Custody and the *Ex Parte* Order of Custody by UPS on either September 29, 2012, or September 27, 2012.

Meanwhile, Respondent began the process of enrolling the children in a Tennessee school on September 18, 2012. Their first day of school was approximately Friday, September 21, 2012. However, Respondent had already allowed the children to visit the school on September 14, 2012, with their cousin, Lindsey, although Petitioner was not receptive to the idea.

Upon receipt of the Tennessee court documents, Petitioner called the Romanian Embassy and then went to the American Embassy in Budapest, Hungary, upon advice of counsel. By September 24, 2012, Petitioner's Hungarian Application for Return had been filed with the Hungarian Central Authority. (Tr. Ex. 23). On October 5, 2012, the United States Central Authority wrote Respondent demanding a voluntary return of the children. (Tr. Ex. 28). Respondent responded to the United States Central Authority refusing a voluntary return on October 22, 2012.

In October 2012, Petitioner executed the Lease Agreement's thirty-day lease notice provision with the tenants on the Hungarian home. She moved back in the home in November 2012. She was in Romania for less than two months. And, obviously, the rest of the family never joined her there.

though he testified that he had no intention of remaining in the U.S. on that date. On September 16, 2012, while in the United States,

On February 14, 2013, Petitioner's Verified Petition requesting the return of the children was filed with this Court. *See* (Docket Entry No. 1).

## II. CONCLUSIONS OF LAW

### A. *The Hague Convention and ICARA*

The Hague Conference on Private International Law adopted the Hague Convention on the Civil Aspects of International Child Abduction in 1980. T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11. In 1988, the United States ratified the treaty and passed implementing legislation, known as the International Child Abduction Remedies Act, 102 Stat. 437, 42 U.S.C. § 11601, *et seq. See generally Abbott v. Abbott*, 560 U.S. 1, 130 S.Ct. 1983, 1989–1990, 176 L.Ed.2d 789 (2010).

ICARA postulates that an individual seeking the return of a wrongfully retained child may "commence a civil action by filing a petition" in a court with jurisdiction over the action. 42 U.S.C. § 11603(b). The federal district courts and state courts have concurrent jurisdiction over such actions. 42 U.S.C. § 11603(a–b). When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered. Hague Convention, Article 19; *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I* "). The Convention seeks to "restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) ("*Friedrich II* ").

Respondent resigned from his job with MSM Romania.

Article 3 of the Hague Convention provides that the "removal or the retention of a child is to be considered wrongful" when "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Ibid.*

Article 12 then states:

"Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith." *Id.*, at 9.

*Chafin v. Chafin*, —— U.S. ——, 133 S.Ct. 1017, 1021, 185 L.Ed.2d 1 (2013).

Once a petitioner meets this burden, return of the child will be ordered unless the respondent prevails on one of the available affirmative defenses. Specifically, a court may decline to return a child if the respondent proves by a preponderance of the evidence that the petition for return was filed more than one year from the removal or retention and the child is well-settled in his new environment; or that the petitioner was not actually exercising his/her custody rights at the time of the removal or retention; or that the petitioner had consented to or acquiesced in the removal or retention; or if the Court finds that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." 42 U.S.C.

§ 11603(e)(2)(B), incorporating Articles 12 and 13 of the Hague Convention.

In addition, pursuant to 42 U.S.C. § 11603(e)(2)(A), a court may decline to return a child if the respondent proves by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation;" Hague Convention, Art. 13(b); or the return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, Art. 20.

## B. Habitual Residence, Wrongful Retention and Custody Rights

To carry her burden of establishing by a preponderance of the evidence that the children were wrongfully retained in the United States, Petitioner must establish that Hungary was the children's "habitual residence" at the time Respondent retained them in the United States, and that Petitioner would have exercised custody rights at the time of the retention had the children not been retained. *Friedrich I*, 983 F.2d at 1400.

### i. Habitual Residence

■ Neither the Convention nor ICARA defines "habitual residence." The Sixth Circuit has stated that habitual residence is not to be confused with "domicile" and that courts must "focus on the child, not the parents, and examine past experience, not future intentions" in determining a child's habitual residence. *Id.* at 1401. "On its face, habitual residence pertains to customary residence prior to removal. The court must look back in time, not forward." *Id.*

In holding that the habitual residence inquiry focuses on "past experience, not

future intentions," the Sixth Circuit in *Friedrich I* stated that the future intentions of the parents are "irrelevant." 983 F.2d at 1401. Thus, the *Friedrich I* court dismissed arguments that "pertain[ed] to the future" and "reflect[ed] the intentions of [the mother]." *Id.* (holding that child's habitual residence was Germany because child was born there and lived there his entire life, despite the fact that his mother, a member of the armed forces, intended to return to the United States upon her discharge).[13]

■ A child's habitual residence is the nation where, at the time of his/her removal, the child has been present long enough to allow acclimatization, and where this presence has a "degree of settled purpose from the child's perspective." *Robert v. Tesson,* 507 F.3d 981, 993 (6th Cir. 2007) (citing *Feder,* 63 F.3d at 224). Such a holding is not only consistent with the collective wisdom of many of "our sister Circuits," but it is also consistent with *Friedrich I*'s holding that a habitual residence inquiry must "focus on the child, not the parents, and examine past experience, not future intentions." *Id.* (citing *Friedrich I,* 983 F.2d at 1401).

■ Respondent urges that the children's habitual residence is the United States. Respondent supports this contention by arguing the children acclimatized to living in the United States (*e.g.* they attend school, go to the doctor and dentist, attend church and have many friends and

family in the United States), well before Petitioner filed her Petition. (Docket Entry No. 54 at 44). In contrast, Respondent contends Hungary is not the children's country of habitual residence. Respondent asserts the family moved out of their home in Budapest, Hungary, with the intent to live and settle in Bucharest, Romania, "which they then in fact did, while the children were in the U.S. visiting their extended family." (*Id.* at 43–44). He further contends, if not the United States, from the children's perspective, their settled purpose was that the family intended to live in Romania since they had abandoned the home in Hungary. (*Id.*).

Petitioner counters that the children permanently resided in Hungary for years immediately preceding their vacation to the United States. (Docket Entry No. 53 at 13). Therefore, Hungary is the children's habitual residence. As the parties' proposed temporary move to Romania had not yet been accomplished, and the children had not moved, Petitioner and Respondent's intention to move or partial move of the family does not alter the finding of Hungary as habitual residence. (*Id.*).

■ A child's habitual residence is not "easily altered" and can be altered only by "a change in geography and the passage of time." *Friedrich I,* 983 F.2d at 1401 (finding that child's three day stay on a U.S. military base was insufficient to establish the United States as his habitual residence).[14] When the family moved to Hun-

**13.** At the time of the *Friedrich I* ruling, the Sixth Circuit was one of the only circuit courts of appeals to have addressed the question of how to determine a child's habitual residence under the Hague Convention. Some of our sister Circuits have parted ways with our decision in *Friedrich I.* Rather than limiting their inquiry to *Friedrich I*'s five guiding principles, these Circuits have introduced an additional factor: the subjective intent of the parents. *See, e.g., Feder v. Evans–Feder,* 63

F.3d 217 (3rd Cir.1995); *Mozes v. Mozes,* 239 F.3d 1067, 1076 (9th Cir. 2001). The merits of the petition will be addressed with these criticisms of *Friedrich I* in mind, but with full awareness that *Friedrich I* remains the law in this Circuit.

**14.** The first relevant inquiry before the Court is whether the children abandoned Hungary as their habitual residence in favor of Romania when the children's move to Romania had

gary in 2004, the children were enrolled in school,[15] which is one of the "central activities" of a child's life, *Feder*, 63 F.3d at 224; *see also March v. Levine*, 136 F.Supp.2d 831, 839 (M.D. Tenn. 2000) (citing *Feder* and relying on school attendance in holding that children's habitual residence was Mexico). The children appear to have attained a degree of settled purpose in Hungary, and statements made by the children during *in camera* interviews indeed bolster the conclusion that Hungary was their habitual residence at the time of their retention in the United States. Both children stated they participated in guitar lessons (which they seemed to particularly enjoy) and were involved in after-school activities with friends (such as dinners at their home and frequenting the local park). They also were fluent in the languages of Hungarian and English. Since 2004, they have lived in Hungary continuously for more than eight years, except for a single trip in 2009 of three weeks to the United States, from which they returned to Hungary until their most recent trip. Furthermore, the evidence shows that the children were to return to Hungary for at least three weeks subsequent to their vacation as they were still enrolled in and scheduled to return to their Hungarian school.

Although the Court acknowledges that the children are United States citizens,[16] were already fluent in English, and were temporarily enrolled in a Tennessee public school, these facts, are not sufficient to outweigh the volumes of evidence suggesting the children would have perceived, and in fact did perceive, their stay in the United States to be merely a temporary vacation.

Accordingly, the evidence about the children's lives in Hungary and their own statements indicate that, immediately prior to their retention in the United States, Hungary was their habitual residence.

ii. Custody Rights

 To establish the children were wrongfully retained in the United States, Petitioner bears the burden of establishing not only that Hungary was their habitual residence, but also that she would have exercised custody rights had the children not been retained in the United States. Under the Hague Convention, a parent's custody rights "must be determined under the law of the child's habitual residence." *Friedrich I*, 983 F.2d at 1402. Additionally, "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich II*, 78 F.3d at 1066.

The Respondent does not argue otherwise and concedes "[i]f the Court determines that Hungary is the habitual resi-

---

not been accomplished. The Court concludes that this is merely a red herring on the part of Respondent, and the children did not, in fact, abandon their Hungarian residence since they had not yet made the move to Romania.

15. The children remained in the school until 2012, wherein they completed the sixth grade.

16. The fact that the children are United States citizens does not alter the calculus, *see Friedrich I*, 983 F.2d at 1401 (finding that citizenship was insufficient to establish that child

was a habitual resident of the United States), nor does the fact that the children have spent a portion of their lives in the United States, as it is the time period immediately preceding their retention in the United States that is at issue in determining their habitual residence, *Feder*, 63 F.3d at 224 (finding the fact that child lived in the United States for six years was not relevant where he was habitually resident in Australia during the six months immediately preceding his retention in the United States).

dence of the children [ ] the Court shall take judicial notice that Mother has rights of custody under Hungarian law." (Docket No. 25, Stipulations at ¶ M).

Pursuant to Article 14 of The Hague Convention, in ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the Court may take notice directly of the following:

. . . . the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of this law or for the recognition of foreign decisions which would otherwise be applicable.

Furthermore, Hungarian law states the following:

Article 72:

(1) The parental supervision is practiced by the parents together—in lack of opposite agreement—even if they do not live together. (4) The parent who practiced parental supervision, respectively the guardianship authority may request the deliver [sic] of the child from the person who keeps the child at him/her [sic] unlawfully.

Article 72(B):

(1) After the placing of the child, the parents living separately shall exercise their rights together—even in case of not having joint custody—in substantial questions concerning the child's future except if the supervision of the parent living separately has been limited, suspended or terminated by the court. (2) Substantial questions concerning the child's future are: determination or changement [sic] of the child's name, determination of his/her residence, the

further direction of the child's education and the determination of his/her career. Act IV of 1952 on Family Code, as amended. *See* (Docket Entry Nos. 1–10 and 25).

Through her testimony at trial, Petitioner has demonstrated not only that the children were habitual residents in Hungary at the time of their retention in the United States, but also that she would have exercised her custody rights at that time if not for their retention. Thus, Petitioner has satisfied her burden of establishing by a preponderance of the evidence that the children were wrongfully retained from Hungary.

## C. Consent and Acquiescence

Article 13(a) of the Convention permits the Court to refuse to order the return of children, despite a wrongful removal or retention, if Respondent proves by a preponderance of the evidence that Petitioner "had consented to or subsequently acquiesced in the removal or retention."

In the case at bar, Petitioner's agreement to allow the children to travel to the United States for a vacation does not constitute consent to their relocation here. The evidence of the deception Respondent perpetrated on Petitioner regarding the children's departure, as well as Petitioner's testimony and the actions she took to secure their return under the Hague Convention overwhelmingly supports the finding that she did not consent to their permanent residence in the United States.

Moreover, Respondent has failed to prove that Petitioner acquiesced in his retention of the children in the United States. Although Respondent argues that Petitioner agreed to an extension of the vacation [17], this delay does not indicate her

17. Petitioner consented to Respondent and the children staying in the United States for

an additional three or four weeks, so they

acquiescence to the children's retention in the United States. Petitioner never said nor did anything which would constitute acquiescence. Rather, after learning of Respondent's intentions, and before she even knew Respondent had begun divorce proceedings, Petitioner's Hungarian Application for Return had been filed with the Hungarian Central Authority. Further, her attempt to negotiate a Tennessee parenting plan with Respondent does not constitute acquiescence.

Therefore, the Court concludes that this defense has not been established by Respondent.

## D. Maturity Exception

Under the second paragraph of Article 13 of the Convention, the Court has the discretion to refuse the return of a child where the child objects and is of sufficient age and maturity such that the objection should be taken into account by the Court.

■ The Convention does not establish a minimum age at which a child is old enough and mature enough for his or her views to be taken into account. The determination of a child's maturity level is "fact-intensive and idiosyncratic." *McClary v. McClary*, 2007 WL 3023563 (M.D. Tenn. 2007) (citing *de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007)).

■ Here, Respondent urges that the children, both age thirteen, are sufficiently mature to testify about their preferences, individually, and they are not unduly influenced by Respondent in their expression of preferences. (Docket Entry No. 54 at 45). Petitioner counters, however, that undue influence by Respondent was "tangible and substantial." (Docket Entry No. 53 at 18). Both children were interviewed by the

Court *in camera*, separately, without the presence of parties or counsel,[18] to determine both their maturity levels and their objections with regard to living in the United States versus Hungary.

Based upon the consideration of the children's testimony, the Court concludes both children have reached the age and maturity level at which their objections, if any, should be taken into account. Although Petitioner argues that any objection stated by the children should be given "little if any weight due to the influence imposed upon them by Father" and undue influence was "tangible and substantial" in this case, there was no evidence of this during the Court's interview with the children.

The children are impressive, well-mannered, and articulate thirteen-year-old boys. They have friends in the United States and Hungary and are extremely involved with music in both places. Additionally, they appear to be good students. Given the choice, both children would prefer to remain in the United States.

Under Article 13 of the Convention, Respondent must establish that "the child objects to being returned and has attained an age and degree of maturity" such that it is "appropriate to take account" the child's views. Respondent has undoubtedly established that both boys have reached the age and maturity level at which their objections, if any, should be taken into account. Nevertheless, although the children displayed a preference (and particularly S.M.O., a strong preference) for remaining in the United States, neither boy expressed an objection to his return. Absent such objection, subsequently, the Court concludes that the maturity excep-

---

could find a solution to their financial difficulties.

18. The interview was on the record, but any transcript prepared thereof will remain under seal.

tion defense has not been established by Respondent.

### III. COSTS

Petitioner asserts she is entitled to an award of her legal fees, legal costs, legal expenses, and travel costs under the ICARA. (Docket Entry No. 53 at 23). Respondent simply asks the Court to deny Petitioner's request for "an award of fees and expenses, given all the facts and circumstances of this case." (Docket Entry No. 54 at 46).

Under ICARA, when a court orders the return of a wrongfully retained child, the court "shall order the respondent to pay any necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees ... and transportation costs related to the return of the child." 42 U.S.C. § 11607(b)(3). The court may not order such costs only if the respondent "establishes that such order would be clearly inappropriate." *Id.*

Petitioner shall file any motion for costs and fees, along with the required supporting documentation, within twenty-one (21) days from the date of the accompanying order, to which Respondent shall file any objections within fourteen (14) days thereafter.

### IV. CONCLUSION

Based on the foregoing, the Court determines that Petitioner has established that the children were wrongfully retained in the United States. Respondent has not established that Petitioner consented or acquiesced to the children residing in the United States, nor does the maturity exception apply to overcome the Hague Convention's general rule requiring the return of wrongfully retained children to their habitual residence. Thus, the Verified Petition (Docket Entry No. 1) will be granted.

The minor children will be ordered to be returned to Hungary.

An appropriate Order will be entered.

### ORDER

For the reasons expressed in the accompanying Findings of Fact and Conclusions of Law, the Verified Petition (Docket Entry No. 1), is hereby GRANTED.

It is further ORDERED that Respondent is immediately to arrange with Petitioner for the prompt return of the children to Hungary.

It is further ORDERED that Petitioner shall file any motion for costs and fees, along with the required supporting documentation, within twenty-one (21) days from the date of this order, to which Respondent shall file any objections within fourteen (14) days thereafter.

It is so **ORDERED.**

